556 A.2d 836

COMMONWEALTH of Pennsylvania, Appellant

v.

William MELSON.

Superior Court of Pennsylvania.

Argued Dec. 8, 1987.

Filed Feb. 9, 1989.

Reargument Denied April 18, 1989.

140

142

Lawrence M. Cherba, Assistant District Attorney, Doyles-town, for Com.

Douglas C. Maloney, Langhorne, for appellee.

Before WIEAND, KELLY and HESTER, JJ.

HESTER, Judge:

The Commonwealth appeals an order entered on June 16, 1987, wherein appellee, William "Country" Melson, was granted a new trial following a jury's finding that he was guilty of first degree murder. The trial court issued the order for Melson's new trial based upon post-trial motions which alleged that prior counsel was ineffective in failing to move to suppress identification testimony obtained through

questionable use of a subpoena and an impermissibly suggestive identification. We affirm.

The facts found by the trial court are as follows. Melson was arrested on August 24, 1984, by Bucks County detectives and charged with conspiracy, robbery and murder in connection with the death of Robert Malarchik. The arrest followed Melson's appearance at the Bucks County Courthouse pursuant to a subpoena. The subpoena had been issued to compel Melson to appear and testify at the sentencing hearing of Eugene Banks, who had already been convicted of Malarchik's murder. The police had suspected that Melson was a co-conspirator, but did not have sufficient evidence to arrest him. They subpoenaed him for Banks' sentencing, hoping to gain additional evidence upon which to base such an arrest. The prosecutor did not expect to have Melson testify at Banks' sentencing.

Melson was aware that he was a prime suspect since he had been interviewed four days prior to the sentencing hearing. He had refused to answer questions without first consulting an attorney and had attempted to obtain advice from Banks' counsel before he appeared at the courthouse for the sentencing. He was not successful in reaching Banks' attorney. Melson went to the courthouse, but decided to leave shortly after he arrived. Detectives advised him that he could not leave. No one at the courthouse questioned Melson about his willingness to testify or discussed the substance of any proposed testimony.

After the sentencing proceeding began, two detectives ordered Melson into the courtroom. They escorted Melson into the courtroom with a detective on each side. At least one of the detectives held him by the arm. He was seated prominently in the front of the courtroom. One of the detectives was publicly known to have been involved in the investigation of the Malarchik murder. Shortly after Melson appeared in the courtroom, the deputy assistant district attorney gestured toward Banks, and Banks nodded his head. At that point, Melson was advised that he was being

placed under arrest, and he was escorted out of the court-
room in the same manner as he had been brought in.

Banks' sentencing was then delayed since he decided to
testify on behalf of the Commonwealth against Melson.
Banks named Melson as a co-conspirator and participant in
Malarchik's murder. Banks' plea agreement provided that
his sentences would run concurrently, that he would remain
in Bucks County prison rather than a state correctional
institution until sentencing, and that a favorable letter
would be written to the parole board by the district attor-
ney's office.

The events surrounding the murder are as follows.
Banks had been a partner with Malarchik in a swingers sex
club known as "The Woodlands" in Bucks County, Pennsyl-
vania. Banks suspected that Malarchik was under-report-
ing the number of patrons and, thus, retaining more than
his share of the profits. Banks asked his then-girlfriend,
Frances Markowitz, to count the automobiles in the parking
lot on several weekend nights. The count of automobiles
confirmed Banks' suspicions. Banks originally intended
only to rough-up Malarchik. He contacted Melson and
another unnamed co-conspirator to assist him, and agreed to
provide them with methamphetamine, as he had in the past,
in return for their help.

Melson and Banks met in the club parking lot on the
night of July 10, 1982. Fran Markowitz was with Banks
and saw Melson briefly. She remembered that he drove a
white Lincoln Continental and that he visited the club
briefly in order to identify Malarchik.

Later, the conspirators agreed to poison Malarchik by
using cyanide in the hope that his death would appear to
have been caused by a heart attack. Banks provided his
accomplices with cyanide, a syringe, handcuffs and an un-
registered gun. Malarchik resisted, the syringe with the
cyanide was broken, and Malarchik instead was shot, stran-
gled, and finally drowned by immersion in a tub. Fran
Markowitz assisted Banks in disposing of Malarchik's body.

When police discovered Malarchik's body, Banks was arrested, and he was convicted partially on the basis of Fran Markowitz's testimony. Although the police were aware that there were co-conspirators, and that one of them drove a white Lincoln Continental and was called "Country," Markowitz was unable to identify Melson from a photographic array. Furthermore, Banks refused to identify his co-conspirators until he observed Melson in the courtroom at his sentencing hearing. Markowitz also attended the sentencing, but did not identify Melson at that time. She did identify him three days later after his picture appeared on the front pages of the local newspaper following his arrest. She later testified for the Commonwealth at Melson's trial and stated she had not seen Melson's picture in the newspaper.

At issue is trial counsel's failure to seek suppression of Markowitz's in-court identification and testimony. The burden of establishing ineffective assistance of counsel rests on the defendant, as counsel is presumed to be effective. *Commonwealth v. McNeil*, 506 Pa. 607, 487 A.2d 802 (1985). In order to prevail, defendant has the burden of establishing that: 1) counsel was arguably ineffective due to an act or omission; 2) the challenged act or omission could not objectively have furthered defendant's interests; and 3) defendant was prejudiced in that, but for the challenged act or omission, there was a reasonable probability the outcome of the trial would have been more favorable. *See Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987); *Commonwealth v. Petras*, 368 Pa.Super. 372, 376, 534 A.2d 483, 484–85 (1987). Where the challenge is to a failure to move for suppression of evidence, the defendant must establish that there was no reasonable basis for not pursuing the suppression claim and that if the evidence had been suppressed, there is a reasonable probability the verdict would have been more favorable. *Kitrell v. Dakota*, 373 Pa.Super. 66, 72–73, 540 A.2d 301, 306, (1988).

Upon careful review of the record, the parties' briefs and the trial court opinion, we find that the trial court properly

granted Melson a new trial on the grounds that the identification by Markowitz should have been suppressed and that trial counsel had no reasonable basis for failing to pursue the suppression issue.[1] The trial court found Melson's claim meritorious in that: 1) the subpoena which compelled Melson's presence at the sentencing was a sham and the identification by Markowitz, which resulted from his appearance, must be suppressed as tainted fruit; 2) Melson was under arrest when he was not allowed to leave the courthouse and had the right to counsel at that point; and 3) the view by Markowitz at the sentencing was unduly suggestive, she did not have an independent recollection from which to identify Melson as a co-conspirator prior to his sentencing appearance, and the view at the sentencing contributed to her identification of Melson as a co-conspirator. We agree with all three positions.

■ Initially, we will discuss the invalid use of the subpoena which compelled Melson's attendance at Banks' sentencing. It was not intended to produce his testimony at the sentencing, but was designed to induce either Melson or Banks to cooperate with the Commonwealth after they observed each other. The prosecutor admitted as much. Thus, the Commonwealth's primary goal was to use a confrontation to gain evidence in a criminal investigation. Furthermore, at the time, Melson was a prime suspect in the investigation. He had been interviewed four days earlier and had refused to testify at the sentencing without first consulting his attorney. He had not yet consulted the attorney when he was compelled to appear at the courthouse and subsequently was led into the courtroom by detectives. The dominant purpose of the subpoena was to engineer a confrontation between Commonwealth witnesses and suspects in order to gain either additional evidence or the identification of a co-conspirator, in this case, Melson. The subpoena achieved this purpose.

1. We note initially that we agree with the trial court that although appellee raised numerous issues of ineffectiveness of trial counsel, only the issues discussed in the text merit detailed consideration. (Trial court opinion, at 2.) His other claims are frivolous.

The use of the subpoena for this purpose is impermissible. A writ "is for the purpose of compelling the attendance of a person whom it is desired to use as a witness.... A writ which does not cause a witness to appear *and give testimony,* and place the witness under the order and censure of the court is not a subpoena." 97 C.J.S. Witnesses § 20 (1957) (footnotes omitted) (emphasis added); *see also Commonwealth v. Wilson,* 158 Pa.Super. 198, 202, 44 A.2d 520, 522 (1945).

■ This invalid use of the subpoena eventually resulted in Markowitz's identification of Melson as a co-conspirator. Further, her identification would not have occurred without this engineered confrontation since she previously had been unable to identify him through a photographic array which contained his picture. Since her identification was the fruit of the impermissible use of the subpoena and since she had no independent basis to identify Melson, her courtroom identification should have been suppressed. Trial counsel had no reasonable basis in failing to seek suppression of the identification.

■ We also agree that Melson was placed under arrest prior to his entry into the courtroom. Accordingly, he had the right to counsel at that time and before he was brought into the courtroom for the purpose of identification by Banks or Markowitz. When Melson indicated that he intended to leave, two detectives prevented him from doing so and then escorted him to the sentencing courtroom. We view this action as placing Melson in custody prior to the identification, and we disagree with the Commonwealth's characterization of this as an investigatory non-custodial stop similar to a traffic stop. *See Commonwealth v. Leninsky,* 360 Pa.Super. 49, 519 A.2d 984 (1986).

In view of all the circumstances, we conclude that Melson was in custody from the time he appeared at the courthouse. He was not free to leave. An arrest has been defined as any act by which an arresting person indicates an intent to take an individual into custody and subject him to control of the arresting person. *Commonwealth v.*

*Nelson*, 488 Pa. 148, 411 A.2d 740 (1980) (defendant deemed to be under arrest when summoned to officer's patrol car). "[A]n arrest may be effectuated without the actual use of force and without a formal statement to the detainee that he is being arrested." *Commonwealth v. Farley*, 468 Pa. 487, 495, 364 A.2d 299, 302 (1976). Nor may an arrest be disguised by using a different term for detention. *Commonwealth v. Farley, Id.*

At judicial criminal proceedings following arrest, a defendant has the right to the presence and advice of counsel. *See Moore v. Illinois*, 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977); *Commonwealth v. Taylor*, 472 Pa. 1, 370 A.2d 1197 (1977); *Commonwealth v. Minnis*, 312 Pa. Super. 53, 458 A.2d 231, (1983). In Pennsylvania, the right to counsel attaches at the time of arrest, and exists for identification confrontations occurring after arrest, except for prompt, on-the-scene confrontations. *Commonwealth v. Richman*, 458 Pa. 167, 320 A.2d 351 (1974). After Melson was no longer free to leave the sentencing, he was under arrest. He was entitled to have counsel present and was not provided with one.

Finally, we agree with the trial court's conclusion that the identification by Markowitz was the result of impermissibly suggestive proceedings. She saw Melson being led into the courtroom by detectives involved with the murder investigation, and placed in a prominent front seat. In addition, Melson was the only black male in the courtroom, and she knew that the co-conspirators were black. Even though Fran Markowitz identified Melson on her own and merely was encouraged, not required, to attend or told to look for a co-conspirator in the courtroom, the manner in which he was brought into the courtroom was impermissibly suggestive.

An in-court identification following a suggestive pretrial identification is only admissible if the Commonwealth can show by clear and convincing evidence that the identification has an independent origin to purge the pri-

mary taint of the impermissible procedure. *Commonwealth v. Bogan*, 482 Pa. 151, 393 A.2d 424 (1978). Instantly, the Commonwealth's witness, Fran Markowitz, did not have an independent recollection of Melson's identity prior to his suggestive appearance. In fact, she was unable to identify Melson in a prior photographic array and her description was vague and imprecise. She was not a victim, but had only seen Melson briefly, at night, two years earlier. We conclude that the identification procedure, if not deliberately arranged, was nonetheless highly suggestive. *See Commonwealth v. Cullen*, 340 Pa.Super. 233, 489 A.2d 929 (1985).

█ We can see no reasonable basis for trial counsel's failure to seek suppression of this identification testimony, since the identification was uncounselled and impermissibly suggestive. We also note that "[t]he failure to file a suppression motion may be evidence of ineffective assistance of counsel." *Commonwealth v. Ransome*, 485 Pa. 490, 494, 402 A.2d 1379, 1382 (1979), citing *Commonwealth v. Roundtree*, 469 Pa. 241, 249, 364 A.2d 1359, 1363–64 (1976). We also agree with the trial court's conclusion that the result of Melson's trial may have been different if Markowitz's testimony had been suppressed. The identification by Fran Markowitz was crucial since she had been given immunity from prosecution and her identification of Melson was the only one that was not tainted. Banks, a convicted murderer, was highly impeachable and had everything (lenient sentencing) to gain and nothing to lose by identifying Melson. Willis Yarborough, another co-conspirator who also testified at the trial, was impeachable on other grounds. Accordingly, there is a reasonable probability that the outcome of Melson's trial would have been more favorable had Markowitz not testified.

Accordingly, we affirm the order granting appellee a new trial.

KELLY, J., files a dissenting opinion.

KELLY, Judge, dissenting:

I respectfully dissent. I agree with neither the majority's statements of the relevant facts, nor its statement and application of the controlling law. I find that William Melson was properly convicted of murder, and that the majority err in reversing his conviction.

## FACTS AND PROCEDURAL HISTORY

Eugene Banks and Robert Malarchik entered into an illicit partnership to run a "swingers sex club" known as "The Woodlands" in Bucks County, Pennsylvania. Sometime after operations commenced, Banks became concerned that he was not receiving his fair share of the profits. Banks suspected that Malarchik was under-reporting the number of patrons on weekends and so he asked his then girlfriend, Fran Shenkin Markowitz, to go to the club and count the cars in the parking lot on several weekend nights. Mrs. Markowitz' reports confirmed Banks' suspicions and fueled his anger.

After first considering "send[ing] someone over to rough him up, beat him up, break an arm or leg, whatever," [1] Banks contracted with appellee and an unnamed co-conspirator to have Malarchik killed. Mrs. Markowitz accompanied Banks to a late night meeting with appellee and another unidentified person in the club parking lot on July 10, 1982. Banks and Mrs. Markowitz parked in the front of the club's entrance, appellee and the other man arrived a short while later and parked next to them. Mrs. Markowitz viewed appellee before and after he entered the club at close range (10 feet), noted his general physical characteristics, and noted the type of car he drove. She also noted the general characteristics of the other man who had remained in the car. On July 14, 1982, Banks, appellee, and the unnamed co-conspirator met and proceeded together to the club. The plan was to poison Malarchik with cyanide in the hope that his death would appear to have been caused by a heart attack. Banks provided his accomplices with cyanide, a

1. (See N.T. 1/10/85 at 15, testimony of Eugene Banks).

syringe, handcuffs and an unregistered gun. The plan, however, went awry and was abandoned in favor of more traditional methods of murder when Malarchik struggled with his assassins. Malarchik was shot, strangled, and finally drowned by immersion in a tub at the club.

Appellee and the unnamed co-conspirator left. Because little money was found at the club, Banks agreed to compensate them for their services by making methamphetamine for them. Banks stayed at the scene and attempted to remove all evidence of the murder at the club and then moved Malarchik's body to a factory building he owned. That night Banks showed the body to Mrs. Markowitz and had her help him place the body in a 50 gallon steel drum and clean up the pool of blood which the body had left on the floor. Banks dipped the gun used to shoot Malarichik into corrosive acid and then placed it in the steel drum with Malarchik's body. Banks then transported the sealed drum to a friend's residence from whence it was to be taken later for burial.

Banks was arrested several days later, after Malarchik's decomposing body was discovered in the steel drum. Mrs. Markowitz was granted immunity and testified against Banks. Throughout the trial process, Banks contended that he had only gone to the club to confront Malarchik and that "Country" and another man who went with him had killed Malarchik without direction from him. However, Banks resolutely refused to identify his co-conspirators. Following a jury trial, Banks was convicted of first degree murder and various related offenses.

Through independent sources the police began to suspect that appellee was Banks' co-conspirator who had previously been described only as "Country." Appellee's nickname was Country and he had access to the type of car known to have been driven by the co-conspirator (a white Lincoln Continental). When questioned by police, appellee acknowledged that he knew Banks but declined to speak further until he consulted an attorney. Appellee did not expressly deny knowledge of or participation in the murder. The

police then served appellee with two subpoenas, one for Banks' sentencing hearing and the other for grand jury proceedings related to the murder scheduled sometime after the sentencing hearing.

When Banks saw appellee at his sentencing hearing, he decided to cooperate with the prosecutors against appellee in the hope that his cooperation might result in leniency at his sentencing. Mrs. Markowitz, who had also been subpoenaed to testify at Banks' sentencing, later reported to the police that appellee, whom she had seen in the courtroom at Banks' sentencing, was the same man whom she saw Banks meet on July 10, 1982, and whom Banks had identified to her as his co-conspirator "Country." Mrs. Markowitz identified appellee as such at appellee's trial.

A jury found appellee guilty of first degree murder and related offenses. After his conviction, new counsel was appointed to represent appellee. In supplemental post-verdict motions, new counsel raised several allegations of ineffective assistance of trial counsel, prosecutorial misconduct and trial error. An evidentiary hearing on those claims was held on May 15, 1986. On January 16, 1987, the trial court filed an opinion which concluded that trial counsel had been ineffective for failing to file a pre-trial motion to suppress all identification testimony from Mrs. Markowitz. The Commonwealth appeals.

## I. STANDARD OF REVIEW

The burden of establishing ineffective assistance of counsel rests upon the defendant, as counsel's stewardship is presumed to be effective. *Commonwealth v. McNeil*, 506 Pa. 607, 487 A.2d 802 (1985). In order to prevail upon a claim of ineffective assistance of counsel, the defendant has the burden to establish: by act or omission counsel was arguably ineffective; the act or omission challenged could not have had an objectively reasonable basis designed to effectuate defendant's interest; and defendant was prejudiced by the act or omission in that but for the challenged act or omission there is a reasonable probability that the

result of the trial would have been more favorable to defendant. *See Commonwealth v. Petras*, 368 Pa.Super. 372, 375–76, 534 A.2d 483, 484–85 (1987) (collecting cases). When, as in this case, a claim of ineffectiveness is based upon the alleged failure to pursue a suppression claim, the defendant has the burden to establish that: the suppression claim was meritorious; there was no objectively reasonable basis designed to promote defendant's interests for not pursuing the suppression claim; and, had the evidence been suppressed there is a reasonable probability that the result of the trial would have been more favorable to defendant. *Commonwealth v. Carelli*, 377 Pa.Super. 117, 125, 546 A.2d 1185, 1188–89 (1988); *Kitrell v. Dakota*, 373 Pa.Super. 66, 73–74, 540 A.2d 301, 305–06 (1988).

Upon careful review of the record, the briefs of the parties and the opinion of the trial court, I find that the trial court, and the majority herein, erred in concluding that appellee met his burden.[2] The trial court held that appellee's underlying suppression claim was meritorious because: although the confrontation between Mrs. Markowitz and appellee was not contrived, it was nonetheless unduly suggestive and there was not a sufficient independent basis to permit her to make an in-court identification of appellee; appellee was under arrest when the police escorted him into the courtroom and therefore was entitled to representation by counsel at the encounter which resulted in the identification of him by Mrs. Markowitz; and the subpoena which compelled appellee's presence in court was a sham and so the identification which resulted from his presence must be suppressed as the tainted fruit of the sham subpoena.

In reviewing a decision of a trial court on a suppression motion we are bound by findings of fact which are supported by the record, but not by the trial court's conclusions of law. *See Commonwealth v. Carelli, supra*, 377 Pa.Su-

---

**2.** I note that I agree with the trial court that although appellee raised numerous allegations of ineffectiveness, only the issues addressed by the trial court and discussed *infra*, merit detailed consideration in this opinion. (Trial Ct.Op. at 2). Appellee's other claims were in fact wholly frivolous.

per. at 129 n. 1, 546 A.2d at 1191 n. 1; *Commonwealth v. White*, 358 Pa.Super. 120, 123, 516 A.2d 1211, 1212–13 (1986). I find each of the three conclusions reached by the trial court to be erroneous.

## II. ALLEGED SUGGESTIVENESS OF THE IDENTIFICATION

The trial court specifically found that: the confrontation between Mrs. Markowitz and appellee was not contrived; Mrs. Markowitz was asked to be present at Eugene Banks' sentencing in order to present rebuttal testimony in case Banks lied in his testimony at sentencing; and, Mrs. Markowitz was not told that appellee or any suspect would be in the courtroom. (Trial Ct. Op. at 8). The trial court, nonetheless, found that an impermissibly suggestive encounter occurred because appellee was escorted into the courtroom by physical force, he was the only black man in the courtroom at the time, and he was seated between two detectives known to be associated with the Banks investigation.

Initially, I note that the trial court's findings of fact are only partially supported by the record. The trial court's finding that appellee was brought into the courtroom by "physical force" is misleading, if not simply unsupported. The only evidence of record regarding the manner in which appellee entered the courtroom was appellee's testimony that, "... there was one detective on each side. One had— *he didn't have a full grip on my arm,* but he let me know which way to go. *He had hold of my arm, yes."* (N.T. 5/15/86 at 16). (Emphasis added). Thus, the "physical force" was slight at most. Similarly, the only evidence as to whether appellee was the only black man in the courtroom was as follows:

Q. And *did you happen to observe* whether there were any other black people in the courtroom *when you came into the courtroom* ?

A. *To the best of my knowledge* I was the only black person in that particular courtroom.

(N.T. 5/15/86 at 17). (Emphasis added). Both the question and the answer were circumscribed by careful limitations. They hardly sustain a finding that he was, in fact, the only black man present during the relevant time period. Finally, I note that though the trial court found that the two detectives who escorted appellee in and out of the court-room were known by everyone (including presumably Mrs. Markowitz) to be associated with the Banks case, *appellee never identified his escorts at that hearing.* Rather, appellee referred to them only as persons who had identi-fied themselves as detectives. (N.T. 5/15/86 at 12-28). There was indication in the record, however, that Detective Gergal, who was associated with the Banks investigation, was one of the detectives who escorted appellee, (based upon Detective Gergal's testimony at appellee's trial). (N.T. 1/14/85 at 129-30).

More important than the above qualifications and objec-tions to the trial court's general findings of fact, however, is the fact that none of the arguably suggestive factors listed by the trial court has in any way been linked to Mrs. Markowitz's identification of appellee. Appellee declined to subpoena Mrs. Markowitz to testify at the evidentiary hear-ing; instead, appellee relied upon the transcript of her trial testimony and the copy of the report of her call to the police after Banks' sentencing hearing. (N.T. 5/15/86 at 71, 107-08). Neither Mrs. Markowitz's trial testimony, nor the police report support a finding that her identification of appellee was the product of undue suggestion.

Indeed, the record strongly supports a contrary conclu-sion. The trial court specifically accepted the Common-wealth's explanation that Mrs. Markowitz was not subpoe-naed for the purpose of identifying appellee and that noth-ing was done to focus her attention on appellee. (Trial Ct. Op. at 8; *see also* N.T. 5/15/86 at 78; N.T. 1/14/85 at 67-70, 78-82). Neither her trial testimony nor the police report indicate the least awareness of the arguably sugges-tive factors indicated; rather, she specifically testified on cross-examination at appellee's trial:

Q. Really, as a matter of fact, [you] had no reason to even pay any attention to him, did you?

A. *When, in the courtroom? No, I didn't.*

Q. At the Woodlands.

A. I saw him get out of the car. Excuse me, sir. When an incident such as that happens things really tend— certain parts really tend to be embedded in your memory.

Q. Absolutely.

(N.T. 1/14/85 at 82) (emphasis added); *see also* (N.T. 1/14/85 at 69). Her report to the police indicated that appellee had been seated *in front* of Mrs. Markowitz in the courtroom but had looked back at her several times. (Police Report 8/27/84). This is the only indication in the record of any factor calling appellee's presence in the courtroom to Mrs. Markowitz's attention. There is no indication in the record that Mrs. Markowitz saw appellee enter or leave the courtroom, that she noticed whether or not other blacks were present in the courtroom, or that the detectives had also turned around so that she could see the faces of the detectives *seated in front of her* so as to be able to identify them as being connected with the Banks case, if indeed they were *known to her* as being part of that investigation.

I find that the record does not support findings or conclusions that Mrs. Markowitz's identification of appellee was the product of undue suggestion. Rather, the record indicates that an unplanned confrontation resulted in a spontaneous identification. *Cf. Commonwealth v. Butler*, 354 Pa.Super. 533, 512 A.2d 667 (1986) (unplanned stationhouse confrontation resulted in an admissible spontaneous identification); *Commonwealth v. Cuellan*, 340 Pa.Super. 233, 489 A.2d 929 (1985) (unplanned courthouse confrontation resulted in an admissible spontaneous identification). As appellee failed to establish the merit of his underlying suppression claim in this respect, counsel cannot be deemed ineffective. *See Commonwealth v. Carelli, supra; Kitrell v. Dakota, supra.*

## III. RIGHT TO COUNSEL AT THE IDENTIFICATION

The trial court held, alternatively, that Mrs. Markowitz's identification of appellee must be suppressed because the confrontation violated appellee's Sixth Amendment right to representation of counsel at post-arrest identification procedures. I find that appellee was not under arrest or subjected to a custodial detention; alternatively, I find that the right to counsel is not violated by the absence of counsel at a post-arrest, unplanned encounter which results in a spontaneous identification.

### A.

The events preceding Mrs. Markowitz's encounter with appellee may be summarized as follows. Appellee was issued a subpoena which directed him to appear for the purpose of giving testimony at Banks' sentencing hearing. Although appellee arrived and checked in at the courthouse, he was later stopped by a police detective when (by appellee's own admission) he was in the process of leaving the courthouse with the purpose of violating the subpoena. (N.T. 5/15/86 at 45–46; *see also* N.T. 5/15/86 at 14). The detective informed appellee that if he was subpoenaed, he was not free to leave the courthouse. At that point, appellee did not feel (subjectively) free to leave. (N.T. 5/15/86 at 16). When the time for Banks' hearing arrived and appellee was not present in the appropriate courtroom, the assistant district attorney directed the detectives to find appellee and bring him to the courtroom. (N.T. 5/15/86 at 94–95). The detectives found appellee in the law library, and informed him that it was time for him to come upstairs to Banks' sentencing hearing. (N.T. 5/15/86 at 15–17). The detectives then escorted appellee to the courtroom with the minimal force indicated (*i.e.* a partial grip on appellee's arm), directed him to a seat, and sat beside him. (N.T. 5/15/86 at 16–17). I do not find that these facts demonstrate a custodial detention or a formal arrest.

Encounters with police may be classified as mere encoun-

ters, non-custodial detentions,[3] custodial detentions, and formal arrests. *See Commonwealth v. Ellis*, 379 Pa.Super. 337, 354, 549 A.2d 1323, 1331 (1988); *Commonwealth v. Douglas*, 372 Pa.Super. 227, 237, 539 A.2d 412, 417 (1988) (plurality); *see generally* LaFave, *Classifying Detentions of the Person to Resolve Warrant Grounds and Search Issues*, 17 U.Mich.J.L.Ref. 417, 417–38 (1984); McGinley, *Characterizing Police Encounters Under the Fourth Amendment: Inquiry, Stop, Arrest?* 10 Search & Seizure L:Rptr. 157, 157–64 (1983); Williamson, *The Dimensions of Seizure: The Concepts of "Stop" and "Arrest,"* 43 Ohio St.L.J. 771, 771–818 (1982). The classification of the encounter determines the applicability and scope of constitutional protections. *See Commonwealth v. Ellis, supra,* 379 Pa.Super. at 354, 549 A.2d at 1331.

A "mere encounter" is one which does not involve a seizure of the person. A seizure of a person sufficient to trigger the protections of the Fourth Amendment occurs "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." *Michigan v. Chesternut,* 486 U.S. 567, —, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565, 572 (1988); *see also INS v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247, 254 (1984); *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 508 (1980) (Opinion of Stewart, J.); *Commonwealth v. Ellis, supra,* 379 Pa.Super. at 354, 549 A.2d at 1331.

The trial court's finding that appellee was not free to leave from the time the detectives came to the library to the time appellee was formally arrested is supported by the record. I agree that a reasonable person would not feel free to leave if he were told by a police detective that he could not leave the courthouse, was later escorted to a courtroom by police detectives, and was then seated between two police detectives. Hence, Fourth Amendment and Article I, Section 8 protections apply.

3. Such encounters with police are also commonly referred to as *Terry* Stops, traffic stops, investigatory detentions, and intermediate detentions.

However, "seizure" and "arrest" are two distinct concepts in the modern criminal constitutional law lexicon. *Commonwealth v. Ellis, supra,* 379 Pa.Super. at 354, 549 A.2d at 1331. While a "seizure" is deemed to occur when a reasonable person would believe he was not free to leave, an "arrest" is deemed to occur only when a reasonable person would conclude that he had been *taken into custody* and subjected to the will and control of the person making an arrest. *See Commonwealth v. Lovette,* 498 Pa. 665, 450 A.2d 975 (1982), *cert. denied* 459 U.S. 1178, 103 S.Ct. 830, 74 L.Ed.2d 1025 (1983).

The mere fact that an individual is subjected to a stop and a period of detention during which the individual is subject to the control of the police and is not free to leave does not render a detention necessarily "custodial." "While a suspect may certainly walk away from a *mere encounter* with a police officer, every traffic stop and every *Terry* stop involves a stop and a period of time during which the suspect is not free to go but is subject to the control of the police officer detaining him." *Commonwealth v. Ellis, supra,* 379 Pa.Super. 355, 549 A.2d at 1331, *quoting Commonwealth v. Douglas, supra,* 372 Pa.Super. at 241–42, 539 A.2d at 419.[4]

Though *Terry, Berkemer* and *Bruder* involved brief detentions, it is important to recall that:

4. *See also Pennsylvania v. Bruder,* 488 U.S. ——, 109 S.Ct. 205, 102 L.Ed.2d 172 (1988) ("although the stop was unquestionably a seizure within the meaning of the Fourth Amendment" ... "ordinary traffic stops do not involve custody for purposes of *Miranda* "; *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (though a "traffic stop significantly curtails the freedom of action of the driver and the passengers, if any, of the detained vehicle," "the non-coercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody,' " unless the suspect "thereafter is subjected to treatment that renders him 'in custody' for practical purposes"); *Michigan v. Long,* 463 U.S. 1032, 1051, 103 S.Ct. 3469, 3482, 77 L.Ed.2d 1201, 1221 (1984) ("[d]uring any investigative detention, the suspect is 'in the control' of the officers in the sense that he 'may be briefly detained against his will....' "); *Commonwealth v. White, supra,* 358 Pa.Super. at 131, 516 A.2d at 1217 ("every *Terry* stop involves both a stop and a period of detention during which the suspect is not free to leave but is subject to the control of the police officer").

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the [suspect]. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second guessing.

*Commonwealth v. White, supra,* 358 Pa.Super. at 127–28, 516 A.2d at 1215, *quoting Commonwealth v. Mayo,* 344 Pa.Super. 336, 341–42, 496 A.2d 824, 826 (1985), *quoting United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 1575–76, 84 L.Ed.2d 605, 615–16 (1985) (rejecting *per se* time limits).[5]

Indeed, police detentions become "custodial" only when under the totality of circumstances the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of formal arrest. *See Commonwealth v. Gonzalez,* 519 Pa. 116, 124–125, 546 A.2d 26, 29–30 (1988) (appellant was not under arrest as he has not shown that he was subjected to restraints comparable to those associated with formal arrest); *Commonwealth v. Ellis, supra,* 379 Pa.Super. at 356, 549 A.2d at 1332 (same); *Commonwealth v. Douglas, supra,* 372 Pa.Super. at 239–40, 539 A.2d at 418 (same); *see also California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275,

---

5. *Accord United States v. Montoya De Hernandez,* 473 U.S. 531, 542, 105 S.Ct. 3304, 3311, 87 L.Ed.2d 381, 392 (1985) (applying *Sharpe;* again rejecting *per se* time limits; and, holding that a sixteen hour detention was reasonable under the circumstances of that case); *Michigan v. Summers,* 452 U.S. 692 at 702 & n. 12, 101 S.Ct. 2587 at 2593 & n. 12, 69 L.Ed.2d 340 at 348 & n. 12 (noting that "[i]f purpose underlying a Terry stop—investigating possible criminal activity—is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in *Terry* and *Adams* "); *Commonwealth v. Douglas, supra,* 372 Pa.Super. at 246, 539 A.2d at 421–22 (classifying a three hour detention as a reasonable investigative detention under the circumstances of that case).

1279 (1983) (*per curiam* ) (*Miranda* applies when suspect is restrained to a degree associated with formal arrest); *Dunaway v. New York, supra,* 442 U.S. [200] at 212, 99 S.Ct. [2248] at 2256, 60 L.Ed.2d [824] at 835–36 (1979) (seizing, transporting, and then questioning a suspect at a police station was custodial as it was "in important respects indistinguishable from a traditional arrest"); *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977) (suspect who voluntarily accompanied police to stationhouse for questioning was not "in custody" where degree of restraint was not equivalent to that associated with formal arrest).

Among the factors which should be considered in determining whether a detention is custodial are: the basis for the detention (the crime suspected and the grounds for suspicion); the duration of the detention; the location of the detention (public or private); whether the suspect was transported against his will (how far, why); the method of the detention (restraints utilized); the show, threat or use of force; and the investigative methods used to confirm or dispel suspicions. *Commonwealth v. Ellis, supra,* 379 Pa.Super. at 356, 549 A.2d at 1332; *Commonwealth v. Douglas, supra,* 372 Pa.Super. at 246, 539 A.2d at 421, *citing* 3 LaFave, *Search and Seizure,* §§ 9.1, 9.2 at 332–422 (2d Ed.1987); *see also LaFave, supra,* 17 U.Mich.J.L. Ref. at 417–38; McGinley, *supra,* 10 Search & Seizure L.Rptr. at 157–64; Williamson, *supra,* 43 Ohio St.L.J. at 771–818.[6]

6. Examples of "totality of the circumstances" reviews may be found in *Commonwealth v. Gonzalez, supra; Commonwealth v. Ellis, supra,* 379 Pa.Super. at 357, 549 A.2d at 1333; *Commonwealth v. Douglas, supra,* 372 Pa.Super. at 246–47, 539 A.2d at 421–23; *Commonwealth v. Fento,* 363 Pa.Super. 488, 498–99, 526 A.2d 784, 786–89 (1987); *Commonwealth v. Grove,* 363 Pa.Super. 328, 340–41 & n. 7, 526 A.2d 369, 375–76 & n. 7 (1987) and *Commonwealth v. White, supra,* 358 Pa.Super. at 131, 516 A.2d at 1217. These cases, and the federal cases previously cited, indicate that review of several if not all of the factors noted above will ordinarily be required (rather than focusing on factors such as the time or location of the detention to the exclusion of other factors).

In the instant case, the trial court concluded that appellee was under arrest because the previously stated facts demonstrated that the detectives "obviously intended to exercise full control over defendant until they received further instructions from the prosecutor. Once the detectives summoned defendant from the library, defendant did not feel free to leave the courthouse." Trial Ct. Op. at 13. Regardless of whether the trial court has correctly divined the *subjective* intent of the detectives and the *subjective* impressions of the appellee, such findings do not support the conclusion that appellee was arrested or subjected to a custodial detention.

The supposed, yet uncommunicated, subjective intent of the detectives to restrain appellee beyond merely ensuring his compliance with the subpoena is not relevant to a determination of whether a reasonable person subjected to the same treatment as appellee could reasonably have concluded that he was being taken into *custody* or being placed under arrest. *See Commonwealth v. Ellis, supra,* 379 Pa.Super. at 358, 549 A.2d at 1333 n. 7; *see also Michigan v. Chesternut, supra,* 486 U.S. at ___ n. 7, 108 S.Ct. at 1980 n. 7, 100 L.Ed.2d at 573 n. 7 ("[o]f course, the subjective intent of the officers is relevant to an assessment of the Fourth Amendment implications of police conduct only to the extent that the intent has been conveyed to the person confronted"), *citing United States v. Mendenhall, supra,* 446 U.S. at 554 n. 6, 100 S.Ct. at 1877 n. 6, 64 L.Ed.2d at 509 n. 6 (Opinion of Stewart, J.) and 3 *LaFave, Search and Seizure,* § 9.2(h) at 407 (uncommunicated intent of police irrelevant).[7] Applying the applicable *objective* standard, I find the evidence insufficient to support a conclusion that a reasonable person subject to the same treatment as appellee could reasonably have concluded that the detectives intended to exercise any control over appellee beyond ensuring

7. *See also United States v. Scott,* 436 U.S. 128, 137–38, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168, 177–78 (1978) (subjective intent alone does not make otherwise lawful conduct illegal or unconstitutional); 1 *LaFave, Search and Seizure* § 1.4(b) "Unexecuted Intent to Act Unlawfully" at 83–85 (2d Ed.1987).

appellee's compliance with the subpoena directing appellee to appear to testify at Banks' sentencing hearing. Viewed objectively, the detention was more analogous to a brief investigative detention designed to preserve the *status quo* than to an arrest or a coercive custodial detention.

There was a reasonable basis for the detention, *i.e.* appellee had indicated an intent to leave the courthouse in order to attempt to illegally evade the subpoena, and was not in the appropriate courtroom when the time for the hearing arrived. The detention occurred in a courthouse and primarily in open court. Though appellee was transported (presumably against his will), the distance was minimal (from the law library to the courtroom) and was for the purpose of ensuring appellee's appearance before the court in compliance with the subpoena. The method of detention involved minimal force, *i.e.* a partial grip on appellee's arm and sitting beside the appellee. No excessive restraints were used. No interrogation of appellee took place during the detention. Finally, the duration of the detention was circumscribed by its legitimate purpose; probable cause for the further detention arose before the legitimate time period for compliance with the subpoena expired.

I find that a wide chasm separates the use of minimal force to ensure that a wandering witness complied with a subpoena and the incommunicado detentions and "third degree" interrogations which powered the constitutional decisions which appellee attempts to invoke here. *Cf. Berkemer v. McCarty, supra,* 468 U.S. at 437, 104 S.Ct. at 3149, 82 L.Ed.2d at 333 (though traffic stops significantly curtail freedom of movement, they do not entail the type of coercion which led to the constitutional decisions upon which the defendant based his claim that an illegal arrest occurred). While the better practice might have been for the detectives to have detained appellee and then to have sought direction from the trial court rather than the prosecutor, I do not find that the detectives acted unreasonably or that the force used was excessive. To the contrary, the prosecutor and the detectives merely anticipated the course

that reasonable prudence would have dictated to the court had appellee's intent to evade the subpoena been communicated to the court rather than the prosecutor.

Based upon the foregoing, I find that the trial court erred in concluding that appellee was "under arrest" or "in custody" at the time he was escorted from the law library to the courtroom where Banks' sentencing was to occur. Because appellee was not under arrest or in custody, his Sixth Amendment suppression claim must fail. Furthermore, as appellee has failed to establish the merit of his suppression claim in this respect, counsel may not be deemed ineffective. *Commonwealth v. Carelli, supra; Kitrell v. Dakota, supra.*

### B.

Alternately, I find that even assuming appellee was under arrest or in custody, no violation of appellee's Sixth Amendment rights occurred. While a suspect is entitled to the presence of counsel at any post-arrest identification procedures (*see generally Commonwealth v. Minnis,* 312 Pa.Super. 53, 58, 458 A.2d 231, 234 (1983)), the Commonwealth could not reasonably be expected to ensure the presence of counsel at every *unplanned* encounter which might result in a *spontaneous* identification, nor is the Commonwealth required to do so. *See Commonwealth v. Butler, supra,* 354 Pa.Super. at 540–41, 512 A.2d at 671–72 (citing cases). In this case, the trial court specifically found that the encounter was uncontrived; consequently, I find appellee's Sixth Amendment suppression claim is without merit. As appellant has failed to establish the merit of his suppression claim in this respect, counsel cannot be deemed ineffective. *Commonwealth v. Carelli, supra; Kitrell v. Dakota, supra.*

### IV. VALIDITY OF THE SUBPOENA

The trial court also concluded that the identification evidence must be suppressed as the tainted fruit of a "sham" subpoena. The trial court reasoned as follows:

At the evidentiary hearing, the prosecutor testified that he had not subpoenaed the defendant to appear at Banks' sentencing for the purpose of parading him before any witnesses (N.T. 5/15/86, p. 77). He did, however, admit that defendant was not subpoenaed to appear at the sentencing *solely* for the purpose of testifying against Banks. If the defendant did not cooperate with the prosecution by admitting his involvement in the murder and testifying against Banks, the prosecutor hoped that defendant's presence in the courtroom would provide sufficient psychological pressure to secure Banks' cooperation against defendant or defendant's cooperation against the third co-conspirator (N.T. 5/15/86, pp. 76–77, 88, 94). The prosecutor admitted that the plan worked. At the hearing, he stated, 'It was Banks seeing Melson that, in my opinion, got him to cooperate' (N.T. 5/15/86, p. 94).

Based on the testimony adduced at the evidentiary hearing, we are satisfied that the process used to compel defendant's appearance at Banks' sentencing was not a true subpoena. In *United States v. Caputo*, 633 F.Supp. 1479 (E.D.Pa.1986), the Court noted the effect of a sham subpoena on the integrity of the judicial process:

> The government properly may use a host of ploys in furtherance of an undercover investigation, but issuance of a spurious order of Court obviously exceeds the bounds of propriety. It reflects upon the integrity of the judicial process; when the government issues a sham subpoena, and it becomes known that it is a sham, it may appear that the Court has improperly participated in the government's investigation. Such an appearance could impair the public's confidence in the Court's role as an impartial adjudicator. *Id.* at 1492 (footnotes omitted).

Here, the prosecutor's conduct in issuing the 'subpoena' was improper and amounted to prosecutorial misconduct. (Trial Ct.Op. at 15–17). (Emphasis in original). I cannot agree.

## A.

The trial court's reliance upon *United States v. Caputo, supra,* is misplaced. First, *Caputo* is materially distinguishable on its facts. The "sham" subpoena in *Caputo* was a sham in that it was issued to the pseudonymous identity of an undercover FBI agent rather than his true identity, in order to preserve his cover. No such "sham" exists in this case. Moreover, the excerpt from the *Caputo* decision relied upon by the trial court was expressly disapproved by the Third Circuit of Appeals when *Caputo* was reversed (*sub. nom.*) in *United States v. Martino,* 825 F.2d 754, 762 (3rd Cir.1987).

## B.

Appellee contended in the trial court that the prosecutor had used the subpoena for the sole purpose of parading appellee before a potential witness, *i.e.* Mrs. Markowitz. Appellee argued in support of this contention that the pretextual nature of the subpoena was demonstrated by the fact that the prosecutor had no reasonable expectation that appellee would agree to testify at Banks' sentencing, and that even if he testified as desired, such testimony would have been merely cumulative of testimony available from other more cooperative witnesses. *The trial court, however, found that the prosecution had not contrived appellee's encounter with Mrs. Markowitz,* thus, specifically rejecting that claim. (Trial Ct.Op. at 8).

## C.

Though the trial court found the subpoena to be a sham, this decision was not based upon a finding that the sole or even dominant purpose of the subpoena was "improper." Rather, the trial court's characterization of the subpoena as a sham was based upon the fact that the prosecutor's purpose for having a subpoena issued to appellee was not *solely* to secure appellee's testimony at Banks' sentencing. (Trial Ct.Op. at 16). The trial court ruled, essentially, that the mere presence of an ulterior motive or a collateral

purpose for the issuance of an otherwise valid subpoena renders the subpoena a "sham." I cannot agree.

Federal courts have consistently held that prosecutorial misconduct is established when it is established that the sole or dominant purpose for the issuance of a subpoena is improper. *See Payden v. United States,* 767 F.2d 26 (2nd Cir.1985); *United States v. Moss,* 756 F.2d 329 (4th Cir. 1985); *see also* Gershman, *Prosecutorial Misconduct,* § 3.2 (1987) (collecting cases). However, under the sole or dominant purpose test, so long as a legitimate purpose exists for issuance of the subpoena, the prosecution is generally permitted to reap the collateral benefits from a subpoena issued with dual motives. *See In re Grand Jury Proceedings (Appeal of Johanson),* 632 F.2d 1033 (3rd Cir.1980); Gershman, *supra* at § 3.2(d)(3) (collecting cases).

There is scant caselaw in Pennsylvania regarding the application of the sole or dominant purpose test to claims of prosecutorial abuse of the subpoena process. In *In re Miller,* —— Pa.Cmwlth. ——, 384 A.2d 599 (1978), the Commonwealth Court stated:

The issue before the Court in the above two cases, which by agreement of the parties were consolidated for hearing and disposition, is whether the Pennsylvania Crime Commission (Commission) has abused its proper investigating authority by here using its subpoena power to supply information to the District Attorney of Delaware County to implement the prosecution of respondents. The able attorneys for respondents do not question the relevance of the information sought but they base their case on what they consider to be a showing that the direct purpose is to develop for the District Attorney a criminal case against respondents.

We do not believe the respondents have established their cases. The Commission's one witness testified as to the proper purpose and denied any association with the District Attorney in regard to supplying evidence to prosecute respondents. The respondents' witnesses, including a former director of the Commission and a former Assist-

ant District Attorney of Delaware County, both testified that there had been no communications between the District Attorney's Office and the Commission regarding developing evidence to prosecute respondents.

Respondents would have us draw an inference from the fact that upwards of 20 subpoenas have been enforced by this Court on the request of the Crime Commission all of which dealt with the relationship the subpoenaed witnesses had with Frank Miller—that the sole or primary purpose was to develop a criminal case against Frank Miller. Especially in view of the direct and positive evidence to the contrary in respondents' own case, no such inference can be drawn.

384 A.2d at 600. Because Miller failed to establish the factual basis for his claim, *i.e.* that the Crime Commission's sole or dominant purpose for issuing the subpoenas was to develop a criminal case against him, the Commonwealth Court had no occasion to determine whether the sole or dominant (primary) purpose test applied in Pennsylvania.

Recently, in *Commonwealth v. Lang*, 517 Pa. 390, 537 A.2d 1361 (1988), our Supreme Court stated:

We find no merit in Lang's assertions that federal case-law requires us to hold that the procedures which we approve today are in fact unconstitutional [....] Furthermore, statements in *United States v. Moss*, 756 F.2d 329, 332 (4th Cir.1985) and *In Re Grand Jury Proceedings (Appeal of Johanson)*, 632 F.2d 1033, 1040 (3d Cir., 1980), which forbid the continuance of grand jury investigations for the sole or dominant purpose of obtaining evidence against a defendant once he is indicted, we regard as limited to the federal schema and as inappropriate to Pennsylvania.

517 Pa. at 401 n. 3, 537 A.2d at 1366 n. 3. I do not read this statement to be a rejection of the sole or dominant purpose test. Rather, our Supreme Court's disapproval of *Moss* and *Johanson* appears to be addressed solely to the issue of whether the use of a grand jury investigation to acquire evidence to support a pending indictment is "improper," and

does not appear to address the issue of whether prosecutorial misconduct would be established by evidence that the sole or dominant purpose for the issuance of a subpoena was improper in some other sense. *See In re Investigating Grand Jury of Chester County (Petition of Lees)*, 518 Pa. 485, 488 n. 4, 544 A.2d 924, 924 n. 4 (1988). *Cf. Agrella v. Rivkind*, 404 So.2d 1113 (Fla.App.1981) (the recognized limits on use of federal grand jury proceedings to support pending indictments do not apply to state grand jury proceedings).

The question of whether the sole or dominant purpose test is to be adopted as the gauge for reviewing claims of prosecutorial abuse of the subpoena process in this Commonwealth thus remains a question of first impression. Upon review of the federal authorities, I find that correctly applied, the sole or dominant purpose test is an appropriate gauge for determining whether corrective action is required to sanction and deter prosecutorial abuses of the subpoena process. I note, however, that there is an important difference between the lawful anticipation of a legitimate collateral benefit and an abuse of the subpoena process solely or dominantly for *improper* purposes.

When the sole or dominant purpose of a subpoena is to harass generally or to encroach upon an individual's constitutional rights, prosecutorial misconduct is established. *See e.g. United States v. Westinghouse*, 788 F.2d 164, 166–67 (3rd Cir.1986) (to harass generally); *Timson v. Weiner*, 395 F.Supp. 1344, 1349 (S.D.Ohio 1975) (to deny First Amendment rights); *Williams v. District Court*, 700 P.2d 549, 554 (Colo.1985) (to disqualify opposing counsel by calling him as a witness, when no necessity for the attorney's testimony exists); *accord United States v. Nechy*, 827 F.2d 1161, 1167 (7th Cir.1987). To constitute misconduct, however, the sole or dominant purpose of the subpoena must be *improper.*

In this case, there was a legitimate purpose to subpoena appellee. The nature and circumstances of the offense were valid concerns at Banks' sentencing hearing; hence, the Commonwealth was entitled to subpoena witnesses to

testify concerning the nature and circumstances of the offense. The police investigation had uncovered sufficient evidence to lead the prosecutor to reasonably believe appellee might have been Banks' co-conspirator and therefore that appellee might have relevant information regarding the nature and circumstances of the offense. Appellee's nickname was the same as that of the co-conspirator, and appellee was known to have access to the type of car used by the co-conspirator. Moreover, when interviewed by the police, appellee acknowledged that he knew Banks, but declined further discussion with the police until he spoke with his attorney. Appellee did not deny knowledge of or participation in the crime at that interview. Though it was certainly possible that appellee might invoke his Fifth Amendment rights when called to testify,[8] the possibility that he might possess and produce evidence relevant to the sentencing proceeding is nonetheless apparent. Hence, the prosecution had a legitimate basis to subpoena appellee.

The prosecutor in this case candidly admitted that he anticipated and desired a collateral benefit to be derived from the subpoena issued to appellee, *i.e.* that the impact on Banks or appellee of their discovery that the prosecutor had drawn the connection between them might cause either or both to decide to cooperate with the prosecution in the hope of gaining leniency at sentencing. Contrary to the majority's assertion, the prosecutor did not admit or even suggest that he would not have called appellee to testify if Banks had not decided to cooperate. Rather, the prosecutor repeatedly stated that appellee's prior statements made the prosecutor hopeful that "when zero hour arrived" appellee would choose to cooperate. (*See* N.T. 5/15/86 at 76–78, 84–85, 89–90). The most that could accurately be said in this respect was that the prosecutor conceded hopeful optimism that one of the two of them would decide to cooperate, and that if Banks cooperated then appellee's testimony

---

8. As appellee had not indicated an express intent to invoke the Fifth Amendment, neither the rule nor reasoning of *Commonwealth v. Bellachio*, 296 Pa.Super. 468, 442 A.2d 1147 (1982) could apply. *See Commonwealth v. Fava*, 503 Pa. 365, 469 A.2d 597 (1983).

would not be needed. With respect to the reasonableness of the prosecutor's hope that appellee might provide relevant testimony at Banks' sentencing hearing, it should be noted that Banks' cooperation was triggered by his belief that appellee was present to give relevant testimony against him at his sentencing hearing. Thus, Banks apparently concurred in the prosecutor's accessment of appellee's potential for cooperation with the prosecution.

I find nothing improper *per se* about confronting a suspect with potentially inculpatory facts or evidence. To the contrary, the decision of when and how to confront a suspect with such facts or evidence is appropriately a matter of police and prosecutorial discretion and tactics. Moreover, so long as a legitimate basis exists to subpoena the suspect as a witness in a proceeding related to the crime of which he is suspected, I find nothing improper about the use of such a court proceeding to heighten the dramatic and psychological effect of such a confrontation. I perceive this to be a legitimate exercise of sound tactics, rather than an abuse of the subpoena process. I note that unconstitutional coercion (*e.g.* "the third degree") is highly unlikely to occur in such a setting. Finally, I note that as long as a legitimate purpose for issuing a subpoena exists, I would find that the intensity of a prosecutor's desire for a legitimate collateral benefit cannot render the subpoena invalid as an abuse of process. It is only when the sole or dominant purpose is *improper* that an abuse of the subpoena process is established.

### D.

Assuming, *arguendo*, that the use of the subpoena to compel appellee's attendance at Banks' sentencing hearing was improper, it does not follow that Mrs. Markowitz's fortuitous, wholly unplanned, and unanticipated identification of appellee must or should be suppressed.

The exclusionary rule generally prohibits the use of physical or testimonial evidence derived as the direct and proximate result of unconstitutional conduct. *See Murray v.*

*United States,* —— U.S. ——, ——, 108 S.Ct. 2529, 2533, 101 L.Ed.2d 472, 480 (1988). However, from its announcement in *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), and *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), to the present date, the exclusionary rule has remained a lightening rod for heated controversy. Though the United States Supreme Court has declined repeated invitations to abandon the exclusionary rule, it has acknowledged the high societal cost involved in the application of the rule, and has limited its application to cases where its general deterrent effects were perceived to outweigh its negative effects on the truth determining process. *See Murray v. United States, supra; California v. Greenwood,* 486 U.S. 35, ——, 108 S.Ct. 1625, 1631, 100 L.Ed.2d 30, 39–40 (1988); *Illinois v. Krull,* 480 U.S. 340, 347–51, 107 S.Ct. 1160, 1165–68, 94 L.Ed.2d 364, 373–77 (1987); *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (*passim* ), *reh den.* 468 U.S. 1250, 105 S.Ct. 52, 82 L.Ed.2d 942 (1984); *United States v. Havens,* 446 U.S. 620, 624–28, 100 S.Ct. 1912, 1915–17, 64 L.Ed.2d 559, 564–66 (1980); *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978) (*passim* ); *Stone v. Powell,* 428 U.S. 465, 482–96, 96 S.Ct. 3037, 3046–53, 49 L.Ed.2d 1067, 1080–88 (1976); *United States v. Janis,* 428 U.S. 433, 443–60, 96 S.Ct. 3021, 3026–35, 49 L.Ed.2d 1046, 1054–64 (1976); *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (*passim* ).

Whether and to what extent there may be a state exclusionary rule in Pennsylvania arising from the Pennsylvania Constitution is uncertain in Pennsylvania. *See Commonwealth v. Montgomery,* 513 Pa. 138, 142–43, 518 A.2d 1197, 1199 (1986); *Commonwealth v. Shaeffer,* 370 Pa.Super. 179, 266–69, 536 A.2d 354, 398–400 (1988) (Kelly, J., dissenting). In light of our Supreme Court's resolute resistance to the *federal* exclusionary rule prior to *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), I find that recognition and application of an independant state exclusionary rule by this Court would be inappropriate absent a clear command by our Supreme Court. *See Common-*

*wealth v. Shaeffer, supra,* 370 Pa.Super. at 268, 536 A.2d at 399 (discussing the prospect of a state constitutional exclusionary rule). I note that our Supreme Court has applied the *federal* exclusionary rule cautiously. In *Commonwealth v. Williams,* 454 Pa. 368, 312 A.2d 597 (1973), they explained:

a prophylactic exclusionary rule is applied only in extreme cases where all other attempts to secure compliance have proven unsuccessful. *See generally Mapp v. Ohio,* 367 U.S. 643, 651–52, 81 S.Ct. 1684 [1689] 6 L.Ed.2d 1081 (1961). In this area there has been no showing of widespread flagrant disregard to justify formulation of such a rule at this time.

454 Pa. at 372, 312 A.2d at 600.

The same may be said here. All that appears from this record is that a single isolated occurrence of an arguable abuse of the subpoena process by a prosecutor resulted in a wholly fortuitous and unanticipated identification of appellee. Even if I were to assume that the subpoena process had been abused, setting appellee free would not appear to be necessary to prevent use of the subpoena process for such purposes in the future. The cost of applying an exclusionary rule here would greatly exceed any benefit to be anticipated.

Moreover, the evidence challenged here is an eyewitness identification of the appellee. Our Supreme Court has held that an illegal arrest of a defendant which merely provided the means for a confrontation more promptly than might otherwise have occurred did not require suppression of the resulting identification. *See Commonwealth v. Garvin,* 448 Pa. 258, 293 A.2d 33 (1972); *see also Commonwealth v. Ryan,* 253 Pa.Super. 92, 384 A.2d 1243 (1978). The United States Supreme Court has likewise expressed reluctance to suppress identification evidence based upon the illegality of the arrest which precipitated the identification. *United States v. Crews,* 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980); *cf. United States v. Ceccolini, supra* (deterrent effects are lesser, and societal costs are greater when

evidence of live witnesses is involved). ·I do not find that the fortuitous, unplanned, and unanticipated identification of appellee by Mrs. Markowitz resulting from the alleged abuse of the subpoena process by the prosecutor is materially distinguishable from the situations in *Garvin, Ryan,* and *Crews,* or that a different result should obtain.

### E.

Based upon the foregoing, I conclude that the trial court and the majority herein err in characterizing the subpoena as a sham, and in concluding that the identification evidence of Mrs. Markowitz was subject to suppression as the tainted fruit of a sham subpoena. As appellee failed to establish the underlying merit of his suppression claim in this respect, counsel cannot be deemed ineffective. *Commonwealth v. Carelli, supra; Kitrell v. Dakota, supra.*

## V. REASONABLE BASIS FOR NOT SEEKING SUPPRESSION

Assuming, *arguendo,* that the underlying merit of the suppression claim had been established, I would find that an objectively reasonable basis for not seeking the suppression of Mrs. Markowitz's identification evidence appears in the record. Succinctly, Mrs. Markowitz's identification evidence was subject to effective impeachment and in fact arguably promoted the defense theory that Banks had made up the story regarding the co-conspirators to shift the responsibility for the actual killing away from himself.

Defense counsel made effective use of this line of reasoning by impeaching the identification evidence of Mrs. Markowitz at trial. (N.T. 1/14/85 at 70–107). Moreover, by presenting evidence that Mrs. Markowitz had little opportunity to view appellee at the July 14, 1982 meeting in the club parking lot, and by developing evidence regarding the means and motive for Banks and Mrs. Markowitz to fabricate her *identification* evidence, counsel was able to cast doubt upon Mrs. Markowitz's credibility *in general.* (N.T. 1/15/85 at 50–56 (closing argument)). A thorough *Kloiber*

charge given by the trial court regarding the need to view Mrs. Markowitz's identification evidence with caution was combined with other cautionary charges regarding her status as an accomplice and the fact that she had been granted immunity. (N.T. 1/15/85 at 118–122). Together, the cautionary charges strongly supported appellee's theory of defense by focusing attention on the impeachment of Mrs. Markowitz's testimony, rather than on other incriminating evidence.

Had the identification evidence been suppressed, the cross-examination of Mrs. Markowitz might not have been as effective. Counsel could not have raised the issue of the incredibility of Mrs. Markowitz's identification evidence to impeach her without opening the door for the prosecutor to address the entire matter on re-direct, thereby nullifying any suppression order. Moreover, the trial court could not have issued its thorough *Kloiber* charge if the identification evidence had been suppressed. Her other testimony (*which was also quite damaging*) might then have been afforded greater weight. Thus, a reasonable tactical basis existed for not pursuing suppression of the identification evidence.

Prior counsel, however, testified at the PCHA hearing that he could not recall why he did not file a suppression motion with respect to Mrs. Markowitz's testimony. He added, however, that he considered her testimony readily impeachable, and that he was primarily concerned with the damaging effect of the testimony anticipated from appellee's erstwhile friend, Willis "Hodgie" Yarborough. (N.T. 5/15/86 at 162–69). The mere fact that counsel could not recall his *subjective* motivation for a particular course of conduct, however, did not require a finding of ineffectiveness.

The ultimate question to be addressed in every ineffectiveness claim is whether counsel's conduct denied the defendant a fair trial. If competent counsel could have pursued the challenged course of conduct for reasons designed to effectuate defendant's interests, the defendant cannot be

said to have been denied a fair trial regardless of prior counsel's testimony regarding his or her subjective motives or reasons. *See Kitrell v. Dakota, supra,* 373 Pa.Super. at 72, 540 A.2d at 305, *citing Commonwealth v. Petras, supra,* 368 Pa.Super. at 376 & n. 1, 534 A.2d at 485 & n. 1. Even if prior counsel asserted the absence of a reasonable basis for his or her course of conduct, the Commonwealth must nonetheless be permitted to present evidence and/or argument that competent counsel could reasonably have pursued the same course of conduct. *Commonwealth v. Petras, supra,* 368 Pa.Super. at 376, 534 A.2d at 485 (the Commonwealth must be given an opportunity to rebut any arguable claim of ineffectiveness). Succinctly, a defendant is not denied a fair trial when counsel does the right things for wrong reasons or no reasons at all.

In the instant case, the challenged conduct, *i.e.* failing to pursue the suppression motion, could reasonably have been adopted by competent counsel as a matter of sound trial tactics. I emphasize, however, that in the instant case the mere existence of a reasonable basis for not pursuing the suppression motion, *i.e.* the desire to use the evidence to impeach the witness, would not have established the objective reasonableness of prior counsel's conduct had counsel not pursued the impeachment of the witness with that evidence at trial. Counsel did so in this case (N.T. 1/14/85 at 70–107); and so, appellee's ineffectiveness claim must fail.

## CONCLUSION

Based upon the foregoing, I dissent. Appellee's underlying suppression claim is without merit; moreover, an objectively reasonable basis for not pursuing a suppression motion is apparent. Hence, the ineffectiveness claim should have failed, the order of the trial court should have been reversed, and the case should have been remanded for sentencing.