637 A.2d 633

**COMMONWEALTH of Pennsylvania,**

v.

**William MELSON, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 15, 1993.

Filed Feb. 16, 1994.

2

4

John J. Kerrigan, Jr., Newtown, for appellant.

Stephen B. Harris, Asst. Dist. Atty., Warrington, for Com., appellee.

Before McEWEN, OLSZEWSKI and HOFFMAN, JJ.

OLSZEWSKI, Judge:

William Melson appeals from judgment of sentence for first-degree murder and conspiracy to commit murder. This appeal marks the second time Melson's case has come before this Court. Melson was initially found guilty of the above offenses by a jury in 1985. The trial court, however, ordered a new trial after determining that Melson's trial counsel was

ineffective for failing to suppress an improper identification. We affirmed the trial court's order in *Commonwealth v. Melson*, 383 Pa.Super. 139, 556 A.2d 836 (1989), *alloc. denied* 525 Pa. 579, 575 A.2d 111 (*"Melson I"*). Melson was tried again and found guilty of the same offenses. In this appeal, Melson raises a number of issues, including the question of whether a trial court may admit the prior testimony of a witness when the witness refuses to testify even under a proper court order. We find that the trial court acted properly in admitting the evidence and in all other regards. We therefore affirm.

Melson, along with Eugene Banks, was charged with the murder of Robert Malarchik. Banks and Malarchik were business partners in a swingers sex club named "The Woodlands." Business relations between the two were not good; Banks suspected that Malarchik was under-reporting the income from the club, thereby cheating Banks out of a share of the profits. The relationship further deteriorated when Malarchik excluded Banks from the club. In July of 1982, Banks asked Melson and another person to help him rough up Malarchik. In return for their services, Banks, a chemist, promised to produce methamphetamine for them.[1]

Melson made several attempts to find Malarchik and intimidate him. Each of these attempts were aborted because Melson was either unable to identify Malarchik or locate Malarchik's house or the Woodlands. In the meantime, Banks's anger grew. Banks and the two men decided to kill Malarchik by injecting him with cyanide. Banks hoped that the cyanide would make Malarchik's death appear to be a natural heart attack. On July 14, 1982, Banks, Melson and the third man drove to Malarchik's home, entered the house and waited for Malarchik to arrive home. When Malarchik

---

1. Banks previously manufactured methamphetamine for Melson in 1974, eight years prior to Malarchik's murder. Banks stopped manufacturing methamphetamine after he was arrested in 1974 for possession of illegal chemicals. Banks was apparently an important supplier to Melson. Several times during the years between 1974 and Malarchik's murder, Melson asked Banks to manufacture more methamphetamine. Banks, however, refused these requests.

arrived, Banks walked outside to meet him and told him that he wanted to talk about financial matters related to the Woodlands. Malarchik said all right and went inside the house with Banks. When Banks and Malarchik began talking in Malarchik's television room, Melson and the third man entered from another room. Melson was holding a gun. Malarchik became angry and charged Melson. Melson shot him in the leg. There was a struggle and Melson shot Malarchik several more times. During the struggle, the third man strangled Malarchik with an extension cord. Malarchik fell to the ground, still breathing. Melson then shot him in the head. In an overabundance of caution, the three men also submerged Malarchik's head in a bathtub full of water. Banks later hid the body in a fifty-five gallon drum located on a friend's property.

Banks was arrested, tried and found guilty of first-degree murder. At the time of Banks's sentencing, Melson had not yet been charged with any crime. In order to obtain Banks's cooperation in its prosecution of Melson and an identification of Melson, the prosecutor used a sham subpoena to compel Melson's presence at Banks's sentencing. The use of the subpoena had its intended effect, for Banks's then-girlfriend, Fran Markowitz, identified Melson at the sentencing, and Banks thereafter agreed to cooperate in the prosecution of Melson. Melson was subsequently charged and tried for first-degree murder and convicted. Banks and Markowitz both testified at the trial. The trial court, however, ordered a new trial because Melson's first counsel failed to suppress Markowitz's identification which stemmed from the prosecution's use of the illegal subpoena. Melson was retried on the same charges and found guilty. Banks, however, refused to testify at Melson's second trial.

## I. Right to Confront Witness

Melson contends that the trial court erred in admitting the prior recorded testimony of Eugene Banks in his trial. Prior to Melson's first trial, Banks was convicted for his role in the Malarchik murder. In preparation for Melson's trial, the Commonwealth negotiated for Banks's testimony against Mel-

8

son and also granted Banks immunity. As a result, Banks testified against Melson in his first trial. Prior to Melson's second trial, however, Banks notified the prosecutor that he would not testify in Melson's second trial. A pre-trial hearing was called in order to decide whether Banks had a right not to testify. After argument, the trial court informed Banks that he could be required to testify and that if he refused, he would be subject to sanctions.

At Melson's second trial, Banks was called to the stand and asked his name, at which point he declared that he would exercise his constitutional right not to answer any question. The court reminded him that he did not have any such constitutional right and ordered him to answer. Banks reasserted a right not to testify, whereupon the court found him in contempt and returned Banks to custody. The prosecution moved to have Banks declared unavailable and for the admission of Banks's testimony from Melson's first trial. The court found Banks unavailable and admitted the testimony. Melson argues that this violated his constitutional right to confront an adverse witness. We disagree.

Both the United States and Pennsylvania Constitutions guarantee the right of the accused to confront witnesses against him. U.S. Const.Amend. VI; Pa.Const. Art. I, § 9. The right of confrontation entitles a criminal defendant to physically face and cross-examine those who testify against him at his trial. *Commonwealth v. Crosland,* 397 Pa.Super. 622, 580 A.2d 804 (1990). The purpose behind the rule is to ensure the integrity of the fact-finding process. *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Cross-examination offers a defendant a tool to sift the conscience of the witness and test the accuracy of his recollection. *Mattox v. United States,* 156 U.S. 237, 242–243, 15 S.Ct. 337, 340, 39 L.Ed. 409 (1895). The presence of the witness at trial allows the jury to look at the witness during cross-examination and judge by his demeanor whether he is worthy of belief. *Id.* The witness's presence also ensures reliability in other ways: one, the witness will have more difficulty lying against someone if the witness is required to physically face the person at

trial; and two, the witness will be required to take the oath—"thus impressing him with the seriousness of the matter and guarding against the lie by the penalty of perjury." *Ohio v. Roberts, supra,* 448 U.S. at 64 n. 6, 100 S.Ct. at 2537 n. 6.

The right to confront an adverse witness, however, is not absolute and must "occasionally give way to considerations of public policy and the necessities of the case." *Crosland, supra,* at 626, 580 A.2d at 806 (quoting *Commonwealth v. Kravontka,* 384 Pa.Super. 346, 351, 558 A.2d 865, 868 (1989)). Where the prosecution establishes that a witness is unavailable, hearsay evidence is admissible provided that the evidence is marked with such trustworthiness that there is no material departure from the reason for general hearsay rule. *Ohio v. Roberts, supra,* 448 U.S. at 65, 100 S.Ct. at 2538; *see also Synder v. Massachusetts,* 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934). In general, evidence is sufficiently reliable if it falls within a firmly rooted hearsay exception. *Ohio v. Roberts, supra,* 448 U.S. at 66, 100 S.Ct. at 2539. The Supreme Court has on several occasions affirmed the admission of hearsay evidence under the prior testimony exception. *See e.g., Mancusi v. Stubbs,* 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972).

The trial court found Banks unavailable and admitted his testimony at trial pursuant to the prior testimony exception to the hearsay rule. "The rationale for admitting former testimony is that cross-examination, the oath, the solemnity of the occasion, and the accuracy with which the statement was recorded assure a high degree of reliability." Packel and Poulin, *Pennsylvania Evidence,* § 804.1 (West 1987); *see also Barber v. Page,* 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968) (prior testimony substantially complies with Confrontation Clause because the defendant is given an opportunity to cross-examine the witness). Melson contends that the trial court erred in admitting Banks's testimony because the prosecution did not adequately establish that Banks was unavailable to testify. Appellant also contends that Banks's prior testimony is not sufficiently trustworthy to be admitted as an excep-

tion to his right to confrontation. We disagree with both contentions.

### (a) Unavailability

The trial court declared Banks unavailable after Banks persisted in refusing to testify even under a proper court order.[2] The test for availability under the Sixth Amendment is broad: a witness is unavailable if the prosecution has made a good faith effort to introduce its evidence through the live testimony of the witness and, through no fault of its own, is prevented from doing so. *Ohio v. Roberts, supra,* 448 U.S. at 74, 100 S.Ct. at 2543 (the "ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness"); *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (although physically present in the courtroom, witness was unavailable for Sixth Amendment purposes when the State made every effort to introduce its live testimony through its witness but witness claimed lack of memory); *Commonwealth v. Jones,* 344 Pa.Super. 420, 430, 496 A.2d 1177, 1182 (1985) ("true test of unavailability is the unavailability of the witness's testimony, not his or her person"); *Commonwealth v. Rodgers,* 472 Pa. 435, 372 A.2d 771 (1977) (witness is unavailable if he invokes the privilege against self-incrimination).

Banks's refusal to testify clearly fits within this test. In preparation for Melson's trial, the Commonwealth negotiated an agreement for Banks's live testimony and granted Banks immunity. After learning that Banks would refuse to testify at Melson's second trial, the prosecution brought the matter to the attention of the trial court in a pre-trial hearing. The trial court informed Banks that he could be ordered to testify. At Melson's second trial, the prosecution properly called Banks to

**2.** We note that the Federal Rules of Evidence specifically allow for a finding of unavailability in such circumstances. Rule 804(a)(2) provides: " 'Unavailability as a witness includes situations in which the declarant ... (2) persists in refusing to testify concerning the subject matter of his statement despite an order of the court to do so." We are unable to find a federal case challenging the constitutionality of this rule on its face.

the stand. Banks then refused to testify even under court order.

Melson offers several arguments against the trial court's finding of unavailability. Melson's first argument is that Banks cannot be labeled unavailable until sanctions have been used to force him to testify. When the trial court found Banks in contempt, it decided to return Banks to custody immediately and defer the question of sanctions until a later date. Melson submits that Banks should not have been found unavailable until after the Court had fashioned some punitive measure such as solitary confinement to put pressure on Banks. We disagree. Whether the trial court has imposed sanctions on a recalcitrant witness is irrelevant to whether the witness is unavailable. The test for unavailability is whether the *prosecution* has made a good faith effort to produce the live testimony of the witness. *Ohio v. Roberts, supra,* 448 U.S. at 74, 100 S.Ct. at 2543. The length to which the prosecution must go to produce the testimony is a question of reasonableness. *Id.; California v. Green, supra,* 399 U.S. at 189 n. 22, 90 S.Ct. at 1951 n. 22 (concurring opinion). The prosecution here spared no effort in attempting to produce Banks's live testimony. The prosecution properly obtained an order directing Banks to testify. The request for the order represents the limits of the prosecution's authority. Banks refused to obey the trial court's order. Whether sanctions should be imposed for Banks's conduct is a matter for the trial court and lies outside the prosecution's bailiwick.

Furthermore, we agree with the trial court's decision to defer the question of sanctions. The decision was obviously due to practical concerns. The court had to the weigh the cost of delaying the trial against the likelihood that sanctions would force Banks to testify. Banks was already serving a life sentence. Where a witness is already serving a life sentence, the possible impact of sanctions is minimal. It would have been, therefore, impractical to delay the trial on the slim hope that Banks might eventually testify.

12

Moreover, a contrary decision would, in effect, confer upon Banks the power to delay, if not prevent, Melson's prosecution. We refuse to place that awesome power in an individual who is not likely to protect the best interest of the public. We also note that Banks would have incredible bargaining leverage over the Commonwealth if he could delay the trial. There is evidence that Banks attempted to use his refusal to testify as a means of getting a retrial in his own case. N.T., 9/24/90, D–1. Banks would obviously have the upper hand on the Commonwealth if he could personally delay Melson's prosecution. The application of sanctions, moreover, would do little to level the playing field since Banks, who is already incarcerated, has almost nothing to lose by going into solitary confinement.

Melson's second argument is that Pennsylvania statutory law does not authorize the admission of prior testimony when a witness refuses to testify. Section 5917, 42 Pa.C.S.A., which provides for the use of prior testimony in criminal trials, only authorizes the use of prior testimony if the witness is: (1) deceased, (2) out of the jurisdiction, (3) cannot be found, or (4) incompetent. Melson argues that because § 5917 does not provide for the admission of prior testimony when a witness refuses to testify, the trial court was not authorized to admit Banks's testimony.

While we agree that § 5917 does not authorize the admission of Banks's prior testimony, § 5917 is not the sole means by which prior testimony may be admitted in a criminal trial. See Commonwealth v. Von Smith, 303 Pa.Super. 534, 450 A.2d 55 (1982); see also Commonwealth v. Scarborough, 491 Pa. 300, 421 A.2d 147 (1980); Commonwealth v. Graves, 484 Pa. 29, 398 A.2d 644 (1979); Commonwealth v. Rodgers, supra. Prior testimony may also be admitted if it meets the requirements of the common law exception to the hearsay rule: the witness is unavailable and the defendant had counsel and full opportunity to cross-examine the witness at the prior proceeding. Commonwealth v. Rodgers, supra. Since Bank's prior testimony meets these requirements, it is admissible regardless of § 5917.

Melson's last argument is that the prosecution cannot claim that Banks is unavailable because it caused the unavailability. According to Melson, the prosecution caused Banks's unavailability because it reneged on the agreement it negotiated for Banks's testimony. But for the prosecution reneging, argues Melson, Banks would have testified. We find this contention meritless.

First, the record indicates that Banks, and not the Commonwealth, reneged on the deal he struck with the prosecution. *See* N.T., 9/24/90, D–1; trial court opinion, 2/2/93, at 3–4. Banks tried to use his testimony in Melson's second trial as means to extract further concessions from the Commonwealth. The Commonwealth was not under any duty to accommodate Banks's demands. Second, even if it can be said that the Commonwealth caused Banks's absence in a "but for" sense, we still find that the Commonwealth is not *per se* precluded from claiming the witness is unavailable. The prosecution is not under any duty to negotiate for the testimony of any witness. Consequently, the prosecution's failure to negotiate a deal or to go through with an agreement, absent perhaps a showing of bad faith, is not the proximate cause of a witness's refusal to testify.

### (b) Reliability

Any hearsay evidence admitted in contravention of a defendant's right to confrontation must be sufficiently trustworthy that admission of the evidence does not offend the purposes of the general hearsay rule. *Ohio v. Roberts, supra; Commonwealth v. Crosland, supra.* Melson claims that Banks's prior testimony is not sufficiently reliable to be admitted in contravention of his right to confront adverse witnesses. Melson claims that Banks's prior testimony is unreliable because: (1) the testimony was secured through an agreement with the Commonwealth, (2) the testimony was inconsistent with the testimony Banks gave at his own trial, and (3) Banks refused to testify at Melson's second trial. We find the prior testimony was sufficiently reliable to be admitted.

14

In *Ohio v. Roberts*, the Supreme Court expressly stated that hearsay evidence is sufficiently reliable without more if it falls within a firmly rooted hearsay exception. 448 U.S. at 66, 100 S.Ct. at 2539; *see also White v. Illinois*, — U.S. —, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992); *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990); *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). Banks's prior testimony clearly falls within the prior testimony exception to the hearsay rule. Banks was under oath at Melson's first trial and subject to cross-examination by Melson's attorney. Prior testimony is considered reliable because the requirement that the defendant have a full opportunity to cross-examine the witness substantially complies with the requirements of confrontation. On the other hand, similar to admissibility of live testimony at trial, the admissibility of prior testimony does not turn on the actual credibility of the witness. In *Ohio v. Roberts*, the defendant argued that a witness's prior testimony was not sufficiently reliable to be admitted because there was extrinsic evidence that the witness had motives to lie in her prior testimony. The Supreme Court, however, refused to embark on a particularized search for indicia of reliability. *Id.*, 448 U.S. at 73, 100 S.Ct. at 2542. The Court noted that the accouterments of the preliminary hearing sufficiently guaranteed the trustworthiness of the testimony for purposes of admitting the evidence in contravention of the defendant's right to confrontation. *Id.*

The criticisms that Melson makes of Banks's testimony concern the credibility of Banks's testimony and not its reliability, for it is not disputed that Banks's prior testimony meets the actual requirements of the hearsay exception. Banks's potential lack of credibility does not render his testimony inadmissible under *Ohio v. Roberts*. Whether Banks's testimony should be credited is a matter for the jury, who may choose to believe all, part, or none of it. *Commonwealth v. Westcott*, 362 Pa.Super. 176, 523 A.2d 1140, *alloc. denied*, 516 Pa. 640, 533 A.2d 712 (1987). We also note that the jury was fully aware of the inconsistencies in Banks's testimony and the terms of the deal he received from the prosecution. During

closing, Melson vigorously argued that these circumstances indicated that Banks's testimony lacked credibility. *See e.g.*, N.T., 10/4/90, at 910.

Melson also argues that Banks's refusal to testify indicates his prior testimony is untrustworthy and, therefore, is inadmissible. We disagree. Banks's decision not to testify was motivated by a desire to extract new promises from the prosecution in exchange for his live testimony. This motivation does not indicate that prior testimony was false. We agree that where a witness refuses to testify a second time on the grounds of the privilege against self-incrimination, an inference arises that the witness's first testimony was false. *See Crosland, supra.* In such circumstances, the prosecution can only introduce the prior testimony if the trial court informs the jury that the witness's refusal to testify is based on a fear that he will be prosecuted for perjury in his prior testimony. *Id.* This rule, however, does not apply to the present case. Banks was granted immunity for his testimony in both of Melson's trials; consequently, he has no reason to fear that he will be subject to a perjury prosecution even if his testimony in the second trial establishes that his prior testimony was false. Banks's refusal to testify, therefore, does not create an inference that his prior testimony was false.

## II. Right to a Fair Trial

Melson also contends that the admission of Banks's prior testimony violated his right to a fair trial because his trial counsel from the first trial was ineffective in his cross-examination of Banks. In 1974, Melson had a sexual relationship with Banks's then wife, Marlene Banks. Melson alleges that Banks's testimony against him is motivated by a desire to get revenge against Melson for the prior affair. Melson's first trial counsel did not cross-examine Banks on the existence of the affair. Melson argues that counsel was ineffective in failing to do so and that admission of Banks's prior testimony in his second trial denied him a fair trial since it saddles him

again with his counsel's ineffectiveness.[3]   Assuming *arguendo* that counsel was ineffective, we still find that the admission of Banks's prior testimony did not violate Melson's right to a fair trial.

Where the prior testimony is tainted by counsel's ineffectiveness, the prior testimony may not be admitted if admission would deny the defendant his right to a fair trial. *Commonwealth v. Mangini*, 493 Pa. 203, 425 A.2d 734 (1981); *see also Mancusi v. Stubbs, supra.*   In *Mangini*, the defendant argued that the trial court erred in admitting a witness's prior testimony because his counsel failed to object to the witness's competency where there were strong indications for doing so.   The Pennsylvania Supreme Court found that there was no reasonable basis for failing to object to the witness's competency and agreed that the admission of the prior testimony violated the defendant's right to a fair trial.   *Id.* at 210, 425 A.2d at 739.   The Court in *Mangini*, however, cautioned that it was not making a *per se* rule requiring exclusion of any testimony from a prior trial wherein trial counsel was found ineffective.   *Id.*   The Court's decision to exclude the prior testimony was premised upon the fact that the ineffectiveness of the prior counsel could not be effectively cured in the second trial.   *Id.*   We find that where remedial measures in the retrial effectively cure the prejudice caused by counsel's alleged ineffectiveness, admission of the prior testimony does not violate a defendant's right to a fair trial.   This conclusion is supported by the long established rule that a defendant is not entitled to a new trial for ineffective assistance of counsel absent a showing of prejudice.   *See e.g., Commonwealth v. Perlman*, 392 Pa.Super. 1, 572 A.2d 2 (1990); *Commonwealth v. Petras*, 368 Pa.Super. 372, 534 A.2d 483 (1987).   We find that steps taken in Melson's second trial effectively remedied any potential prejudice caused by counsel's failure to cross-

3.   It is not clear from the record whether Melson's counsel even knew about the affair at the time of the first trial.   If, through no fault of his own, Melson's counsel was unaware of the existence of the affair during the first trial, we could not find him ineffective for failing to cross-examine Banks on it.

examine Banks on the existence of the affair between Melson and Marlene Banks.

Prior to Melson's second trial, the parties stipulated to the existence of the affair between Melson and Marlene Banks. The trial court subsequently read the stipulation to the jury prior to closing arguments. N.T., 10/4/90, at 881. The evidence of the affair was also introduced through another witness. N.T., 10/3/90, at 736. During his closing argument, Melson's attorney argued to the jury that Banks's adverse testimony was motivated by revenge. N.T., 10/4/90, at 904. We find that the stipulation and the fact that Melson's counsel argued that Banks's testimony was motivated by revenge sufficiently cured any potential prejudice caused by the first counsel's failure to cross-examine Banks on the affair. Consequently, the admission of Banks's former testimony did not result in a constitutional violation of Melson's right to a fair trial.[4]

Melson contends that these remedial steps did not adequately cure the prejudice caused by his counsel's ineffectiveness. Melson correctly points out that the jury in the second trial did not have the opportunity to observe Banks's demean-

---

4. In *Commonwealth v. Bazemore*, 531 Pa. 582, 614 A.2d 684 (1992), the Pennsylvania Supreme Court ruled that a witness's prior testimony from a preliminary hearing was not admissible at trial because the Commonwealth failed to disclose to the defense vital impeachment evidence regarding the witness prior to the preliminary hearing. The Court concluded that the Commonwealth's non-disclosure of the vital evidence denied the defendant a full and fair opportunity to cross-examine the witness. The witness's testimony did not consequently meet the requirements of the prior testimony exception. The Commonwealth argued that the witness's prior testimony was admissible because the defendant had the opportunity to indirectly impeach the witness by introducing the vital impeachment evidence at trial. The Court, however, rejected this argument on the ground that the indirect impeachment was not an adequate substitute for the live cross-examination.

While we are bound by the Supreme Court's ruling in *Bazemore*, we find that the case is inapposite to the facts *sub judice*. First, it is clear the Commonwealth is in no way responsible for the alleged failure of Melson's counsel to cross-examine Banks on the affair. Second, we do not find that the affair constituted vital impeachment evidence. In such circumstances, we find that introduction of the impeachment evidence at trial was an adequate substitute for live testimony.

or and attitude while he was being cross-examined about the affair. We note, however, that even if Banks had been cross-examined on the affair in the first trial, the jury in the second trial would still not be able to judge his demeanor, since Banks's testimony was read by the prosecution. Consequently, the inability of the jury to observe Banks's demeanor was caused by Banks's unavailability and not by trial counsel's alleged ineffectiveness.

Melson also contends he was prejudiced by the fact that the jury was deprived of an opportunity to learn what Banks's verbal response would be to any question concerning the affair. We disagree. Prejudice is determined by an evaluation of whether "but for" the arguably ineffective act or omission, there is a reasonable probability that the result would have been different. *Commonwealth v. Petras, supra.* We are not persuaded that it is probable that Banks's actual answers to cross-examination would have changed the result in the second trial.

First, Melson has not established that Banks even knew about the affair. The stipulation between the parties states that Banks never gave his former wife any indication that he knew about the affair. N.T., 10/4/90, at 881. The conclusion that Banks did not know about the affair is also supported by the fact that Banks and Melson continued to be associates after the affair occurred. If Banks did not know about the affair, obviously it could not have affected his testimony. Consequently, the cross-examination of Banks on the affair might have been entirely fruitless.

Second, even if Banks did know about the affair, the evidence of record indicates that it would not have affected his testimony. As stated above, Banks and Melson continued to be associates after the affair occurred. If Banks truly wanted to harm Melson, we doubt that he would continue to associate with Melson and wait eight years to extract his revenge. Cross-examination of Banks on the affair would probably do nothing more than underscore the fact that Banks had a possible motive for lying. This was effectively accomplished by the stipulation and the closing argument of counsel.

### III.  Prior Bad Acts

Melson contends that the court erred in allowing the Commonwealth to introduce evidence regarding his involvement in the sale of methamphetamine, a controlled substance. Specifically, Melson contends that the trial court should have prohibited the Commonwealth from introducing evidence that Banks promised to manufacture methamphetamine for Melson in exchange for Melson's help in murdering Malarchik and that Melson sold methamphetamine from 1974 until the time of the murder in 1982.  Melson contends that the evidence was irrelevant and highly prejudicial to him since it painted him as a drug dealer.  The decision to admit evidence of prior bad acts is committed to the discretion of the trial judge and will not be reversed on appeal absent an abuse of discretion. *Commonwealth v. Tedford,* 523 Pa. 305, 567 A.2d 610 (1989). We find no such abuse.

In general, the Commonwealth may not introduce evidence of prior crimes or bad acts to show a defendant's bad character or his propensity to engage in criminal activity. *Tedford, supra.*  The evidence is excluded in order to prevent a defendant from being convicted based upon prior unrelated bad acts, instead of his involvement in the present crime. Where prior bad acts, however, are relevant to whether defendant committed the present crime, evidence of such crimes may be admitted even though admission results in prejudice to the defendant.  *Commonwealth v. Gelber,* 406 Pa.Super. 382, 594 A.2d 672 (1991); *Commonwealth v. Hall,* 523 Pa. 75, 565 A.2d 144 (1989).  In particular, evidence of prior crimes is admissible if it is relevant to proving:  (1) motive, (2) intent, (3) absence of mistake or accident, (4) a common scheme, plan or design, or (5) identity.  *Gelber, supra.*  The Commonwealth may also introduce evidence of prior bad acts if they "form part of a chain or sequence of events which form the history of the case and were part of its natural development."  *Tedford, supra,* 523 Pa. at 328, 567 A.2d at 621.

Evidence that Banks promised to manufacture methamphetamine for Melson in exchange for Melson's murder of Malarchik is clearly admissible to establish that Melson had a motive to kill Malarchik. Melson and Malarchik were complete strangers to each other. Banks's promise helps explain why Melson would intentionally kill a complete stranger. Evidence of Melson's past involvement with methamphetamine was also admissible since it helps explain why Banks's offer would motivate Melson to murder Malarchik. An offer to produce methamphetamine would only influence a person who is involved in the distribution of methamphetamine, or perhaps other illegal drugs.

### IV. Prosecutorial Misconduct

Melson also complains that his case should have been dismissed because prosecutorial misconduct denied him a fair trial. Banks was tried and convicted of murder prior to Melson's trial. At the time of Banks's trial, Melson had not yet been charged with the murder of Malarchik. The prosecutor used a unlawful subpoena to compel Melson's presence at Banks's sentencing. The admitted purpose of the unlawful subpoena was to assist the prosecution in building its case against Melson. The prosecutor hoped that Melson's presence at Banks's sentencing would induce Banks to cooperate with the prosecution in its expected case against Melson. The prosecution also hoped to gain an identification of Banks by Fran Markowitz, Banks's girlfriend at the time of the Malarchik murder. The subpoena accomplished both goals, for Markowitz identified Melson at the sentencing hearing and Banks agreed to cooperate.

In *Melson I*, this Court found that the subpoena was illegal since it was used to obtain evidence against Melson, instead of being legitimately used to compel Melson's testimony against Banks at his sentencing hearing. We agreed that Markowitz's identification, which stemmed from the procedure, was tainted and should have been suppressed by Melson's trial counsel in the first trial. Consequently, we affirmed the trial court's order granting a new trial. Melson now complains that his case should have been dismissed prior to his second trial

because the prosecution's use of the subpoena was intended to deprive him of a fair trial. We disagree.

First, Melson mischaracterizes the prosecution's use of the subpoena. The purpose of the subpoena was to obtain evidence against Melson, not deny his right to a fair trial. *See Melson I, supra,* 383 Pa.Super. at 146, 556 A.2d at 839 ("The dominant purpose of the subpoena was to engineer a confrontation between Commonwealth witnesses and suspects in order to gain either additional evidence or the identification of a co-conspirator, in this case, Melson."). Second, the subpoena did not deny Melson a fair trial. Neither Melson's access to evidence, nor his right to present evidence were in any way affected by the subpoena.

While we disapprove of the prosecution's use of the subpoena, the solution is to cure the prejudice caused by the subpoena, not simply let the defendant go. In *Melson I,* this Court determined that Melson was entitled to suppress evidence obtained through the subpoena. Consequently, we agreed that Markowitz's identification should be suppressed. This suppression of Markowitz's identification adequately vindicated Melson's rights.

### V. Right to an Impartial Jury

Melson, an African–American, contends that his Sixth Amendment right to an impartial jury was violated because the jury was selected from a panel that included no members of his race. Melson argues that *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), requires that a jury be selected from a panel that includes members of a defendant's race. We disagree.

The Federal Constitution prohibits all forms of purposeful racial discrimination in the selection of jurors. *Id.* In *Batson v. Kentucky,* the Supreme Court reaffirmed that the Sixth and Fourteenth Amendments prohibit the prosecution from using peremptory strikes to purposely exclude members of a defendant's race from the jury on account of their race. The Court's rationale was two-fold. First, a defendant's right to an impartial jury requires that the selection of a jury be

governed by non-discriminatory criteria. *Id.* at 86, 106 S.Ct. at 1717. Second, selection procedures that purposefully exclude jurors on the basis of race undermine public confidence in the fairness of our system of justice. *Id.* at 87, 106 S.Ct. at 1718.

While we give due consideration to *Batson v. Kentucky* and its lineage, we fail to see how it applies here. There is no evidence of record which indicates that the selection of Melson's jury panel involved purposeful discrimination.[5] It is well-settled that the Sixth Amendment does not require that the jury perfectly mirror the community and reflect the various distinctive groups in the population. *Id.* at 85 n. 6, 106 S.Ct. at 1717, n. 6; *Commonwealth v. Jones,* 465 Pa. 473, 350 A.2d 862 (1976). Consequently, the fact that Melson's panel lacked members of his race does not establish a violation of his constitutional right to an impartial jury. In *Commonwealth v. Jones, supra,* the defendant argued that his right to an impartial trial was violated because the number of black jurors on his petit jury was disproportionate to the number of blacks living in the county in which he was being tried. The Pennsylvania Supreme Court rejected the defendant's claim, stating "a defendant in a criminal prosecution is not constitutionally entitled to demand a proportionate number of his race on the jury panel that tries him." *Id.* at 479, 350 A.2d at 866.

Melson further argues that a pre-trial hearing should have been held on whether his right to an impartial jury had been violated. In *Commonwealth v. Jones,* 452 Pa. 299, 304 A.2d 684 (1973), the Pennsylvania Supreme Court ruled that a defendant is entitled to a pre-trial hearing if he establishes a prima facie violation of his right to an impartial jury. This

5. The only evidence in the record regarding the selection process is this statement of the trial judge:

> Jury panels are selected by computer. We have a new and different panel in here every day. I don't know that we even know what race the juries represent when they are selected. The entire jury panel for a year is some 35, 37,000 jurors. I'm not certain but I believe and this could be bourne out I suspect—that our percentage of black jurors over time is almost double the percentage of black persons living in the county.

N.T., 9/27/90, at 7, 8.

rule, however, does not apply to Melson, for his allegations do not establish the violation of any constitutional right. At the very least, a defendant must allege that the under-representation of his race on the jury panel is due to a systematic exclusion of the group in the jury selection process. *Commonwealth v. Henry*, 524 Pa. 135, 143, 569 A.2d 929, 933 (1990), *cert. denied*, 499 U.S. 931, 111 S.Ct. 1338, 113 L.Ed.2d 269 (citing *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)). Melson does not allege any such systematic exclusion, rather, he merely complains that his race was under-represented. As stated before, the fact that a defendant's jury does not proportionately mirror identifiable groups in the community does not by itself indicate any constitutional violation.

## VI. Sufficiency of the Evidence

██ Defendant challenges the sufficiency of the evidence in his conviction for first-degree murder. The standard applied in reviewing a sufficiency claim is well-settled:

> We must determine whether, viewing all the evidence at trial, as well as all reasonable inferences to be drawn therefrom, in the light most favorable to the Commonwealth, the jury could have found that each element of the offense was proven beyond a reasonable doubt. Both direct and circumstantial evidence can be considered equally when assessing the sufficiency of the evidence.

*Commonwealth v. French*, 396 Pa.Super. 436, 440, 578 A.2d 1292, 1294 (1990), *aff'd*, 531 Pa. 42, 611 A.2d 175 (1992); *see also Commonwealth v. Baker*, 531 Pa. 541, 614 A.2d 663 (1992).

First-degree murder is defined as the intentional killing of another human being. 18 Pa.C.S.A. § 2501–2502. Banks's testimony indicates that Melson killed Malarchik in exchange for Banks's promise to manufacture methamphetamine. N.T., 10/1/90, at 219–226. On the basis of this testimony, the jury could have properly concluded beyond a reasonable doubt that Melson intentionally killed Malarchik. Melson contends that Banks's testimony is insufficient to convict him because of the

"incredible inconsistencies of his stories." Appellant's brief at 39. This bare-bones argument does not present sufficient material for this Court to review Melson's complaint. Furthermore, we note Melson's argument clearly ignores our standard for reviewing sufficiency arguments. We are obligated to review the evidence in the light most favorable to the Commonwealth. Since the jury believed Banks's testimony, we must assess the sufficiency of the evidence from the viewpoint that Banks's testimony implicating Melson is credible.

## VII. Prejudicial Remark

Melson's last contention is that he was denied a fair trial because the trial court made a prejudicial remark. Before trial, the parties agreed that they would refer to Melson's first trial as a "prior proceeding", and not as a prior trial. After the prosecution read Banks's prior testimony to the jury, the trial court explained to the jury that the prosecution had read an excerpted version of Banks's prior testimony. The testimony did not include any question and answer where an objection had been sustained in the first trial, nor did the prosecution read any legal arguments made during the course of Banks's prior testimony. The trial court informed the jury that the testimony was excerpted so that the jury members would not be under the impression that Banks's testimony in the prior trial went as smoothly as it was read. During the course of its explanation, the trial court inadvertently referred to the Melson's first trial as a trial, instead of a "prior proceeding."[6] Melson contends that the trial court's remark prejudiced his right to a fair trial.

6. The inadvertent remark occurred during the following explanation to the jury:

> While we are going over this thing, while they are checking the record out, members of the jury, one thing that I neglected to inform you. As a result of the prior hearing we had with the witness Eugene Banks, we did have some anticipation this might happen just this way, and what we have done is gone over the prior transcript, we have eliminated both question and answer if it was sustained, and also where there was argument and discussion about the questions on the objections we have cleaned that all up, so it will read very smoothly. We just didn't want you to get the idea that the *trial* was a

First, we note that Melson's counsel neither objected to the court's reference, nor asked for a curative instruction. We find that the failure of Melson's counsel to bring the possible prejudicial error to the attention of the trial court constitutes a waiver of the objection. *See Commonwealth v. Gordon*, 364 Pa.Super. 521, 528 A.2d 631, *alloc. denied*, 517 Pa. 621, 538 A.2d 875 (1987). Counsel's failure to object deprived the trial court of an opportunity to fashion a curative instruction that might remedy any potential prejudice.

Second, assuming *arguendo* that the trial court's remark was prejudicial to Melson, we still find that he is not entitled to a new trial. It is well-settled that not every prejudicial remark by the prosecutor or the trial court will result in the granting of a new trial. *Commonwealth v. Goins*, 508 Pa. 270, 495 A.2d 527 (1985). A new trial is only required when the unavoidable effect of the remark is to "prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a fair verdict." *Commonwealth v. Anderson*, 501 Pa. 275, 282, 461 A.2d 208, 211 (1983). The trial court's remark was so insignificant it could not possibly have compromised the jury's ability to render a fair verdict.

Judgment of sentence affirmed.[7]

whole lot smoother and there weren't objections and things of that sort, but since we had that testimony, we have cleaned it up completely insofar as objections and things of that nature are concerned. So that is why it will read the way it does.
N.T., 10/1/90, at 202–203 (emphasis added).

7. Melson's brief also contains the following question presented: "Did the court err in certain evidentiary rulings." An appellant is required to present questions that identify specific rulings by the trial court or contain specific legal questions. *Commonwealth v. Sanford*, 299 Pa.Super. 64, 445 A.2d 149 (1982). The above question does neither and, thus, presents no issue for appellate review. The intent of Melson's counsel in framing such a general question was obviously to do an end run around the Rules of Appellate Procedure. In the argument portion of his brief, Melson's counsel incorporates nine issues under this question. These issues are in addition to the other eight questions he presents, which brings the total number of issues presented to 17. While there is no limit to the *number* of questions an appellant may present, an appellant is limited to *one page* of reviewable questions.

Pa.R.A.P. 2116. Melson's counsel apparently incorporated his nine issues into one general question in order to avoid violating this rule.

We also note that none of the evidentiary errors alleged by Melson are reviewable. Melson merely lists the alleged errors without any argument. Melson's failure to develop his argument concerning these issues constitutes waiver of his claims. *See Commonwealth v. Gonzalez,* 415 Pa.Super. 65, 608 A.2d 528 (1992); *Commonwealth v. Long,* 367 Pa.Super. 190, 532 A.2d 853 (1987), *alloc. denied,* 518 Pa. 617, 541 A.2d 744 (1988).