J.S43044/14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| CORDERO SMITH, | : | |
| | : | |
| Appellant | : | No. 2243 EDA 2013 |

Appeal from the Judgment of Sentence August 1, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division No(s).: CP-51-CR-0001649-2012

BEFORE: GANTMAN, P.J., ALLEN, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                **FILED NOVEMBER 21, 2014**

Appellant, Cordero Smith, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas following his jury conviction of murder in the first degree[1] and related offenses. Appellant argues the trial court erred in admitting, under Pennsylvania Rule of Evidence 804(b), the preliminary hearing testimony of a Commonwealth witness because police failed to make reasonable efforts to locate the witness and therefore the Commonwealth did not establish the witness was unavailable for trial. We affirm.

The instant convictions stem from the shooting death of Shawn

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(a).

Jackson, nicknamed Shizz, in Philadelphia on February 7, 2011, around 5:00 p.m. The witness at issue in this appeal is Appellant's friend, B.C. At the time of the shooting, B.C. was approximately seventeen and a half years old.[2] We set forth in detail the relevant facts.

On the first day of trial, July 30, 2013, out of the jury's presence, the Commonwealth requested the court to declare B.C. unavailable and to admit B.C.'s preliminary hearing testimony as substantive evidence. N.T., Trial Vol. 1, 7/30/13, at 15. In support, the Commonwealth called Sergeant Steven Purcell, of the juvenile unit of the District Attorney's Office, who testified to the following. Approximately two months earlier, on June 3, 2013, Sergeant Purcell attempted to serve a subpoena on B.C. at juvenile court. The sergeant was in the waiting room outside a courtroom, and the court crier pointed out B.C. and his mother as they exited the courtroom. As Sergeant Purcell introduced himself, B.C. "took off and ran out of the waiting room." *Id.* at 20. B.C.'s mother said she would tell B.C. about the subpoena and took a copy of it, but she refused to sign the subpoena.

Police Officer Alfred Hindley then testified to the following efforts to find B.C. He and his partner "culled the different databases in Philadelphia Police Department" and found "several locations within the residence [sic] in the 19th district in Upper Darby, Pennsylvania." *Id.* at 24. Twelve days

---

[2] Appellant was eighteen years and ten months old at the time of the shooting.

before trial, on July 18, 2013, the two officers went to the home of his mother ("Mrs. C.") on Dunlap Street; there was no response. On July 23rd, they returned to the mother's house, and later that day went to the home of B.C.'s father ("Mr. C."). There was no response at either home. The following day, July 24th, the officers again went to Mr. C.'s residence, and this time a woman, who stated she lived there, met them. The woman called Mrs. C., and Mrs. C. told Officer Hindley she had not seen B.C. since June 4th and "had no idea of his whereabouts." *Id.* at 26. Officer Hindley gave Mrs. C. contact information for the prosecuting attorney, and Officer Hindley "believe[d] she did" call the attorney shortly afterward. *Id.* The woman at Mr. C.'s house said she would leave a message for Mr. C. about the officers' visit.

"[D]uring all of this time throughout these dates from July 18 on, [Officer Hindley and his partner] found out [B.C. had] several interactions with police in the 19th District in and around the area of Dunlap Street where [they] attempted to make service. [They] also checked those areas of where he was frequently stopped by police to no avail." *Id.* at 27. On the day before trial, the court issued a bench warrant for B.C. For "a little bit over an hour," the officer surveyed the area in the 19th Police District, where B.C. previously "had several interactions with police." *Id.* at 27, 29.

Officer Hindley was unable to find B.C.[3]

Appellant argued the officers had not made enough efforts to prove B.C. was unavailable. The trial court disagreed and found the officers were "unable by process or other reasonable means to procure [B.C.'s] attendance." *Id.* at 30-31. The court thus allowed B.C.'s preliminary hearing testimony.

We now review the following trial evidence, which is pertinent to Appellant's argument on appeal. Approximately five months after the shooting, on August 2, 2011, B.C. provided the following written statement to police:

> [Appellant] and I walked towards Girard Avenue from 56th and Thompson Street. We were walking down 57th Street. [Appellant] said that he was going to walk down to Girard Avenue to see who was down there. We seen Shizz[, the victim,] out on the corner. [Appellant] started walking faster and he walked in front of me. [Appellant] pulled his shirt up and got the gun out. [Appellant] was in the middle of the street and he started shooting at the corner that Shizz was standing on. I just turned around and ran back toward 57th Street and went home.

N.T. at 146. The gun was black and Appellant fired about ten shots "straight," without pause between them. *Id.* at 147. A few days later, B.C. saw Appellant at 56th Street and Lansdowne Avenue. B.C. told police:

> I asked [Appellant] was he cool [sic] and he said yeah. Then I asked who did he hit and he told me the guy's

---

[3] Both Sergeant Purcell and Officer Hindley later provided the same testimony to the jury.

> name was Shizz. I asked him if the boy died and he told
> me yeah. Then we changed the conversation.

*Id.* at 148. Appellant did not say why he shot the victim, and B.C. did not know the victim. *Id.* at 143, 148, 164. B.C. signed all three pages of the statement after reading it. *Id.* at 140, 149.

On February 7, 2012—approximately six months after giving the above statement—B.C. appeared at Appellant's preliminary hearing as a Commonwealth witness. B.C. testified that he knew Appellant but, in contradiction to his above statement, denied that he was with Appellant at the time of the shooting and denied seeing him shoot the victim. *Id.* at 139. The Commonwealth confronted B.C. with the prior written statement to police. B.C. acknowledged that he signed the statement, but stated that some of statements were not true and that he had not in fact made other statements. Specifically, B.C. denied telling the police that he walked with Appellant down 57th Street, they saw the victim standing in the middle of the street, and Appellant shot at him. *Id.* at 146. B.C. also denied telling the police that he heard and saw the gun and that he saw Appellant a few days later. *Id.* at 147, 148.

On cross-examination—at the preliminary hearing—B.C. testified as follows. He was at juvenile court with his parents when three detectives arrived and took him, in handcuffs and without his parents, to the police station. *Id.* at 151-53. The detectives took B.C. to an interrogation room and he was kept there for eight to nine hours. *Id.* at 153, 156. After

making the statement, the detectives took B.C. back to the detention center. B.C. called his parents, who did not know where he was or who took him. *Id.* at 165. When asked several times why the police statement had statements that B.C. purportedly did not make, B.C. replied that the police told him the narrative and warned that if he did not agree to it, they would charge him with the murder. *Id.* at 157, 159-60, 161. B.C. again testified that he was not with Appellant at the time of the shooting, and specifically stated that he "lied to the detectives." *Id.* at 158. Finally, B.C. stated that he had a prior gun adjudication in juvenile court, for which he was in placement at the time of the preliminary hearing. *Id.* at 163. We note that at trial, the transcript of B.C.'s entire preliminary hearing testimony was introduced, including his direct, cross-, redirect, and re-cross examinations. *Id.* at 138-170.

The Commonwealth also called eye-witness Aleisha Pope, whose occupation was a corrections officer; she testified to the following. She and her daughter were sitting in her car, parked one block from the shooting and facing the corner of Girard Avenue and 57th Street. *Id.* at 74, 82. Pope heard ten to twelve gunshots and saw a man "standing in the middle of [the] street, raise his arm, and . . . fire[ ] shots" toward the corner of 57th Street and Girard Avenue. *Id.* at 77-80. Pope shielded her daughter but did not duck down and saw the man "fire the entire time." *Id.* at 78, 79, 100. When the shooting stopped, the man walked or lightly jogged away and

passed Pope's car on the passenger side. *Id.* at 80, 84-85. Pope "[got] a good look at his face." *Id.* at 85.

Pope talked to the police when they arrived five to ten minutes later, and about an hour after the incident, she went to the police station. *Id.* at 88. On May 24, 2011, Pope again went to the police station and identified Appellant in a photo array. *Id.* at 90. Pope did not know Appellant but stated at trial that she had no doubt he was the person she saw firing the gun. *Id.* at 93.

Defense counsel cross-examined Pope on her inconsistent testimony as to when she first told the police that she saw tattoos on Appellant's face, *id.* at 102, 108, as well as her direct-examination testimony that she chose Appellant in the photo array by "process of elimination" and "pick[ing] out [the] light skinned person . . . because the rest are dark skinned." *Id.* at 108. On redirect examination, however, Pope testified that she chose Appellant in the photo array because she "remember[ed] the tattoo." *Id.* at 112.

The jury found Appellant guilty of first-degree murder, possessing an instrument of crime, and carrying a firearm without a license.[4] The trial "Court immediately imposed the mandatory sentence of life in prison for the

---

[4] 18 Pa.C.S. §§ 907, 6106.

murder charge."[5] Trial Ct. Op., 1/13/14, at 1. Appellant did not file a post-sentence motion but took this timely appeal.[6]

On appeal, Appellant challenges the court's admission of B.C.'s preliminary hearing testimony as substantive evidence at trial. Appellant asserts "that four police visits to a witness' parents' homes[ ] and looking 'in the area[ ]' cannot suffice . . . to prove a witness' unavailability." Appellant's Brief at 13. He asserts the police's efforts to find B.C. were a "paucity," and lists reasonable actions the police should have also undertaken: notifying the police in the district about B.C., posting his photo, contacting B.C.'s known associates or acquaintances, and checking hospitals, morgues, and jails. *Id.* at 13-14. Appellant also asks this Court to adopt the federal "principle that 'the more crucial the witness, the greater the effort required to secure his attendance.'" *Id.* at 13 (citing ***Cook v. McCune***, 323 F.3d 825, 835 (10th Cir. 2003)). Appellant maintains there was "absolutely no scientific or physical evidence" adduced at trial, and instead the Commonwealth only presented "two witnesses who could allegedly link [him] to the crime." *Id.* Appellant contends that the eyewitness, Pope, "had a limited opportunity to observe" and had omitted

---

[5] The court also imposed sentences of nine months to two years for possessing an instrument of crime and three to six years for the firearm offense, all to run concurrently. Sentencing Order, 8/1/13.

[6] Previously, upon Appellant's motion, this Court remanded this case to allow Appellant to file a Pa.R.A.P. 1925(b) statement and the trial court to prepare a responsive supplemental opinion. Order, 2243 EDA 2013 (Nov. 8, 2013).

"the one signature detail" about him—a facial tattoo—to the police. *Id.*

Appellant describes the Commonwealth's other witness, B.C., as "a juvenile

delinquent who failed to appear and who police never aggressively searched

for." *Id.* We find no relief is due.

We note the relevant standard of review:[7]

> "Questions regarding the admission of evidence are left to
> the sound discretion of the trial court, and we, as an
> appellate court, will not disturb the trial court's rulings
> regarding the admissibility of evidence absent an abuse of
> that discretion." An abuse of discretion is not merely an
> error of judgment; rather, discretion is abused when "the
> law is overridden or misapplied, or the judgment exercised
> is manifestly unreasonable, or the result of partiality,
> prejudice, bias, or ill-will, as shown by the evidence or the
> record." . . .

*Commonwealth v. Trinidad*, 96 A.3d 1031, 1036 (Pa. Super. 2014)

(citations omitted).

Pennsylvania Rule of Evidence 804(b) allows, as an exception to the

hearsay rule,[8] former testimony "if the declarant is unavailable as a

---

[7] In his reply brief, Appellant avers that the standard of review of a
Confrontation Clause claim is plenary and the scope is *de novo*. Appellant's
Reply Brief at 1. However, in ruling on the Commonwealth's request to
admit B.C.'s former testimony, the trial court stated, "There is no
confrontation clause issue because you had all the discovery and no vital
impeachment evidence was not turned over [sic]." N.T. at 31. Appellant did
not object to this statement. Accordingly, we deem the issue before this
Court as whether the trial court erred in admitting evidence under the
hearsay exception of Rule 804.

[8] "Hearsay is 'a statement, other than one made by the declarant while
testifying at the trial or hearing, offered in evidence to prove the truth of the

witness." Pa.R.E. 804(b)(1)(A)-(B). While Rule 804 includes several parameters for the admission of former testimony, Appellant's sole claim in the instant appeal is that the Commonwealth failed to establish the unavailability of B.C. Accordingly, we consider Subsection (a)(5) of the rule:

> **(a) Criteria for Being Unavailable.** A declarant is considered to be unavailable as a witness if the declarant:
>
> \* \* \*
>
> (5) is absent from the trial or hearing and the statement's proponent has not been able, by process or **other reasonable means**, to procure:
>
> (A) the declarant's attendance, in the case of a hearsay exception under Rule 804(b)(1)[.]

Pa.R.E. 804(a)(5)(A) (emphasis added).

This Court has stated:

> The test for availability under the Sixth Amendment is broad: a witness is unavailable if the prosecution has made a good faith effort to introduce its evidence through the live testimony of the witness and, through no fault of its own, is prevented from doing so. **Ohio v. Roberts**, [448 U.S. 56, 74 (1980)] (the "ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness")[.]

**Commonwealth v. Melson**, 637 A.2d 633, 637 (Pa. Super. 1994) (additional citations omitted). "The length to which the prosecution must go to produce the testimony is a question of reasonableness." **Id.** at 638.

---

matter asserted.' Pa.R.E. 801(c)." **Trinidad**, 90 A.3d at 727. Generally, hearsay is not admissible. Pa.R.E. 802.

Our review of Pennsylvania caselaw has not revealed a discussion on what constitutes "reasonable means" with a similar factual scenario. *See e.g. Commonwealth v. Stays*, 70 A.3d 1256, 1263 (Pa. Super. 2013) (stating witness "was clearly unavailable under" meaning of Rule 804(b) where witness died before trial); *Commonwealth v. Lebo*, 795 A.2d 987, 990-91 (Pa. Super. 2002) (holding Commonwealth did not make good faith effort under 42 Pa.C.S. § 5917 to locate witness where Commonwealth stated at trial that two days earlier, officer learned witness was in boot camp in North Carolina and had two more weeks, but Commonwealth did not offer any information of whether it had subpoenaed witness); *Commonwealth v. Nelson*, 652 A.2d 396, 398 (Pa. Super. 1995) (upholding trial court finding that Commonwealth made good faith effort to produce witness' live testimony where witness was called to stand at trial, Commonwealth asked numerous, repeated questions, offered notes of testimony to refresh recollection, and promised not to ask questions about witness' unrelated homicide indictment, but witness "steadfastly refused to answer any questions or to read any prior statements to refresh his recollection"); *Commonwealth v. Smith*, 647 A.2d 907, 910-11 (Pa. Super. 1994) (noting trial court precluded former preliminary hearing testimony of confidential informant ("CI") where CI appeared but refused to testify at defendant's trial, but upholding preclusion of confidential informant's former testimony on ground that defense counsel did not have fair and full opportunity to

cross-examine CI at preliminary hearing about any plea deals he made with Commonwealth).[9]

We find guidance in **Commonwealth v. Faison**, 305 A.2d 44 (Pa. 1973), which was decided before the 1988 adoption of Rule 804. In that case, our Supreme Court stated, "A defendant's right to confront witnesses guaranteed by the Sixth Amendment [is] violated by the use of prior testimony unless the prosecution can establish that a good faith effort was made to secure the witnesses['] attendance." **Id.** at 46. The prosecution knew that the arresting police officer-witness was retired and lived in New Jersey, and it had the address where he received pension payments. **Id.** This Court found the Commonwealth failed to establish the witness was unavailable where it "only established that efforts to contact [the witness] by telephone were not successful," and "[n]o attempt was made to secure [his] compulsory attendance at the . . . hearing." **Id.** at 47. Nevertheless, this Court held that the trial court's error was harmless, where the prior testimony admitted "covered less than one page" and "was only background testimony about [the defendant's] arrest and did not concern the [defendant's] signed written confession or any of the circumstances surrounding the obtaining of the confession[, which was the main issue]."

---

[9] **See also CONRAIL v. Del. River Port Auth.**, 880 A.2d 628, 631 (Pa. Super. 2005) (holding plaintiff's reliance solely on witness' membership in witness protection program and failure to take any steps to procure witness's appearance did not establish witness was unavailable under Rule 804).

*Id.*

We find the underlying facts present a close case. The actions undertaken by police to locate B.C. are not in dispute. Instead, whereas the trial court found the actions amounted to reasonable efforts under Rule 804, Appellant argues they did not. We are mindful that our standard of review for evidentiary rulings is abuse of discretion. **See Trinidad**, 96 A.3d at 1036. We also emphasize that "[t]he test for availability under the Sixth Amendment is **broad**" and that that the Commonwealth must show reasonableness and good faith in its efforts to locate a witness. **Melson**, 637 A.2d at 637, 638 (emphasis added).

Pursuant to this authority, we decline to disturb the court's holding. The witness B.C. was a juvenile, though at the time of trial, he was one month shy of turning twenty years old. Nevertheless, his mother had accompanied him to juvenile court on June 3, 2013. Despite the fact that they were in a courthouse and B.C. had just emerged from a proceeding in his own delinquency matter, B.C. fled upon Sergeant Purcell's mere introduction of himself.[10] Twelve days before trial, Officer Hindley and his partner went to the homes of both of B.C.'s parents and on the following day, spoke with a woman at his father's house. This woman called B.C.'s mother, who told Officer Hindley she had not seen her son since June 4th,

---

[10] Later, while testifying to the same events before the jury, Sergeant Purcell stated, "I told him I was a sergeant, I needed to talk to him about a subpoena I had for him." N.T. at 120.

the day her mother was buried—and which we note was the day after the unsuccessful attempt of service at juvenile court. "During all of this time . . . from July 18 on," Officer Hindley and his partner also canvassed the area around Mrs. C.'s house, where B.C. previously "had several interactions with police." N.T. at 27. We decline to find the trial court's ruling that the officers made good faith and reasonable efforts to locate B.C. was manifestly unreasonable or the result of partiality, bias, or ill will. **See** Pa.R.E. 804(a)(5)(A); **Trinidad**, 96 A.3d at 1036; **Melson**, 637 A.2d at 637.

Finally, we decline Appellant's request to adopt as law "the principle that 'the more crucial the witness, the greater the effort [is] required to secure his attendance." **See** Appellant's Brief at 13. Finding no basis for relief, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>11/21/2014</u>